## NATIONAL LIFE & ACCIDENT INS. CO. v. RINGO.

### No. 12836.

Court of Civil Appeals of Texas. Dallas.
Feb. 10, 1940.

Rehearing Denied March 9, 1940.

Read, Lowrance & Bates, of Dallas, for appellant.

Currie McCutcheon and Bruce Graham, both of Dallas, for appellee.

YOUNG, Justice.

The suit below was for damages resulting from an assault upon appellee, inflicted by one of appellant's collection agents; the insurance company prosecuting this appeal from a jury verdict and judgment for $500, the parties being hereinafter designated as in the trial court. Plaintiff's petition relating to the events preceding the assault, stated: That on April 5, 1938, about 7:30 P. M., one P. L. Brown (defendant's said agent) visited plaintiff's home for the purpose of collecting weekly premiums on policies of insurance carried by plaintiff in defendant's company, and: "That defendant's agent, servant and employee Brown upon coming to plaintiff's home as aforesaid became angry at plaintiff, and accused plaintiff of being delinquent in the payment of the premiums due defendant on said policy and demanded of plaintiff that plaintiff pay defendant one extra week's premium, claiming plaintiff was in default one extra week in the premiums due defendant Company; that without just cause or provocation, said Brown struck plaintiff in the face and over his body, and cut plaintiff with a knife, * * *." However, plaintiff's narrative of what led up to the affray is somewhat different. He testified, in substance, that at the time, he was carrying four policies with defendant company, for himself, his wife, and two daughters, the premiums payable weekly; that the collecting agent, Brown, was admitted into the dining room of his home, where $1.80 was collected on the policies, being premiums for two weeks. This sum was there credited in duplicate receipt books in the possession of each party, when plaintiff began to insist that such amount paid his policies two or three weeks in advance, instead of one week as both books indicated. It is undisputed that Brown's prior visitation and collection of premiums was on March 22, when four weekly payments were made on each policy, being for the weeks beginning the 7th, 14th, 21st and 28th of said month.

In the ensuing altercation as to payments and correctness of the books, the agent was told to leave and not return; plaintiff indicating either that the insurance would be dropped, or other methods used in making further payments. Their dispute appeared to become more heated as the parties proceeded to the front of the house; plaintiff, as he testified, being invited by Brown to "Come on outside and we will just fight it out." Following is the testimony of plaintiff at this point, upon cross-examination:

"Q. * * * Now, Mr. Ringo, you couldn't settle the question of the one week being paid and not shown on the books, as you claimed, only one week in advance and you claimed it should be two weeks, you couldn't settle that by going out in the yard in the dark, could you? A. I don't think so.

"Q. No. What did you go out there to settle? A. I just went out there because he pulled the door open and asked me out on the porch.

"Q. Well, what were you going to settle when you went out there? A. Well, wasn't going to settle anything when he opened the door.

"Q. Well, didn't he say, 'Come out and let's settle it'? A. Well, he said that a dozen times."

Then came the assault, Brown using, either offensively or defensively, a knife. Mrs. Ringo gave a similar statement of the controversy, as did the agent, who insisted, however, that throughout the affair, plaintiff was continually the aggressor.

Brown further testified that all collections were turned in to defendant's office; that he had no interest therein, save that, if such policies lapsed, the company would charge a certain amount against him in new business; and, in connection with the dispute, he informed plaintiff that he did not have to drop the insurance, " * * * he could pay it in to the office if he was dissatisfied with my collection."

The principal issue submitted and jury answer thereto, was: "Issue No. 1: Do you find from a preponderance of the evidence that at the time and on the occasion of plaintiff's injury P. L. Brown was acting within the apparent scope of his authority as an employe of the defendant, The National Life & Accident Insurance Company? Answer either 'yes' or 'no'. By the term 'apparent authority', as used in this charge, is meant that authority which an agent appears to have by some act on the part of the principal. Answer: Yes."

Appellant moved for instructed verdict at the close of the testimony, and for judgment non obstante veredicto after the jury had made their several findings.

Brown had visited plaintiff's home, making collections, for some time prior to the above difficulty. No antecedent ill-feeling is shown to have existed between them. There was no contention made on the trial that the sums paid on April 5 were not properly credited; or that the duplicate receipt books did not correctly reflect the status of the policies as to weekly payments. Brown's duties as agent for the company were: To solicit business, write applications, deliver policies, and collect premiums.

■ Appellant's main presentment of error is embodied in its second proposition, namely, that the evidence wholly fails to show that the agent Brown was acting within the apparent scope of his authority in making the assault; likewise, the record indisputably discloses that at the time of said assault, said agent was not acting in the accomplishment of any purpose for which he was employed, but was actuated solely by personal animosities, and in resentment of supposed insults engendered by plaintiff. On the other hand, appellee submits that the authority of Brown to act for appellant in the whole of the transaction, culminating in the assault, was properly for the jury's determination. We must, of course, view the evidence most favorably toward plaintiff in considering defendant's motions for judgment, made before and after the jury verdict.

■ It is first to be noted that neither the pleading nor the evidence raises an issue of "apparent authority" on the part of the agent Brown. This species of agency is based on estoppel, and, to be available, must be both alleged and proven: 2 Tex.Jur. (Agency) p. 637, § 217; Continental Oil Co. v. Baxter, Tex.Civ.App., '59 S.W.2d 463. Substituting the court's definition for the term "apparent authority", the jury's finding of fact in Issue No. 1 was that, at the time and on the occasion of the assault upon plaintiff by P. L. Brown, the latter was acting under authority he appeared to possess, by reason of some act on the part of the National Life & Accident Insurance Company. The record discloses that defendant had invested its agent with no appearance of authority on the particular visit, other than to collect an amount of premium and credit same in the duplicate receipt books, as on previous and regular trips. Hence no act of defendant company can be pointed out in the evidence on which could be predicated the issue of apparent or ostensible authority.

But plaintiff argues that the assault resulted from a quarrel which immediately grew out of the collection of weekly premiums, a duty which the agent was employed to perform. We conclude from the Texas decisions in point, that where injuries are wilfully inflicted by an agent or servant upon a third person, the liability of the master is mainly dependent upon the duties incident to the employment and the actual facts from which liability is claimed. As stated by the Supreme Court, in International & G. N. R. Co. v. Anderson, 82 Tex. 516, 17 S.W. 1039, 1040, 27 Am. St.Rep. 902: "To hold the master liable for the act of his servant, it is not necessary that the servant should have authority to do the particular act. The act of the servant may be contrary of his express orders, and yet the master may be liable. But the act must be done within the scope of the general authority of the servant. It must be done in furtherance of the master's business, and for the accomplishment of the object for which the servant is employed. For the mode in which the servant performs the duty he is engaged to perform, if wrongful, and to the injury of another, the master is liable, although he may have expressly forbidden the particular act. But whether the act in question can be implied from the general authority conferred upon the servant must, in general, depend upon the nature of the service he is engaged to perform, and the circumstances of the particular case."

■ Whether the servant was acting within or without the scope of his employment at the time of the negligent or wilful act, is generally for the jury's determination; Chicago, R. I. & G. R. Co. v. Carter, Tex.Com.App., 261 S.W. 135; but, not so, we think, when the outer limits of the servant's authority and duties are clearly shown. The rule of respondeat superior does not apply when it is evident that the servant is not engaged upon any duty for which he is employed, when committing the assault, though the transaction, as in the instant case, be a continuing one. "When the servant turns aside, for however short a time, from the prosecution of the master's work, and engages in the doing of an act not in furtherance of the master's business, but to accomplish some purpose of his own, whether in doing so he is actuated by malice or ill will * * *, there is no principle which charges the master with responsibility for such action."

Hidalgo v. Gulf, C. & S. F. R. Co., 60 Tex.Civ.App. 433, 128 S.W. 683, 685, writ refused; International & G. N. Railway Co. v. Anderson, supra.

In the situation at hand, the authority of Brown, the agent, extended only to collecting premiums and crediting the amount thereof in the receipt books. This, he did, with no power to arbitrate the difference, if any existed, as to how far such moneys advanced the payment of the weekly premiums; and Brown's proposal to plaintiff that the matter be concluded outside the house, indicated no more than the settlement of animosities arising from a personal quarrel. As we view the facts of this record, the fight settled nothing concerning plaintiff's insurance with appellant. An adjustment of the pending controversy, either by wager of battle, or otherwise, was not within the province of said agent, whose employment with appellant merely furnished the opportunity for the wrongful act. Although the facts are somewhat dissimilar, the reasoning of the Eastland Court, in Home Telephone & Electric Co. v. Branton, Tex.Civ.App., 7 S.W.2d 627, 629, affirmed by Commission of Appeals, 23 S.W.2d 294, is quite applicable. There, the Telephone Company had placed a pole, guy wire and anchor on plaintiff's land, without his consent, and upon protest, the company's local manager, Beardon, had repeatedly promised to remove the pole and attachments. Plaintiff later encountered Beardon near the latter's office and the assault followed. Chief Justice Hickman there pertinently observed: "In what manner was Paul Beardon furthering the business of appellant when he committed the assault? According to appellee's own testimony, he was struck by Beardon as an immediate resentment of an insulting epithet applied by him to Beardon. Beardon was not engaged in the erection of the telephone pole upon appellee's land, nor in the removal thereof when the assault occurred. The assault within itself was not necessary to and did not have the effect of either continuing the alleged trespass or removing it from appellee's land. While the erection of the telephone pole was the remote cause of the difficulty, it was too remote to connect appellee with it."

We turn to a consideration of the cases cited by appellee, which are, principally: Chicago, R. I. & G. R. Co. v. Carter, supra; Davis v. Clark, Tex.Civ.App., 78 S.W.2d 1008; Id., 129 Tex. 520, 105 S.W.2d 190; Gulf, C. & S. F. R. Co. v. Cobb, Tex.Civ. App., 45 S.W.2d 323, error dismissed; Central Motor Co. v. Gallo (Waco), Tex. Civ.App., 94 S.W.2d 821; Wells Fargo & Co. Express v. Sobel, 59 Tex.Civ.App. 62, 125 S.W. 925, error refused; New Ellerslie Fishing Club v. Stewart, 123 Ky. 8, 93 S.W. 598; 9 L.R.A.,N.S., 475. In each of the above decisions, the act (assault or injury) was committed by the servant *in doing that which he was employed to do.* (Italics ours). For example, in the Cobb case, the injury followed an interference with switching duties of the engine foreman; and, in Central Motor Co. v. Gallo, supra, where the repair shop manager, authorized to adjust differences with customers, assaulted a patron while engaged in such duty, the court said [94 S.W.2d 822]: "The real test of the master's liability is, not whether the servant's employment contemplated the use of force or whether the act complained of was done in accordance with the master's instructions, but whether the act complained of arose directly out of and was done in the prosecution of the business that the servant was employed to do".

More analogous to the present record is Hidalgo v. Gulf, C. & S. F. R. Co., supra, where the facts, briefly, were: Phillips, the watchman, was employed to guard railroad property and to see that freight at the depot was carried away by authorized persons. He challenged the teamster Hidalgo's right to load articles from the depot onto a wagon and, after some words, went over to an adjacent boarding house, to which the teamster also repaired after completing his load. Phillips there asked defendant's warehouse foreman, Annear, about the freight, and was assured that same had been properly checked out to Hidalgo. A colloquy immediately ensued between the watchman and Hidalgo, in which the latter was killed. A suit against the railroad company resulted in a directed verdict for defendant. An appeal was affirmed and writ of error expressly refused by the Supreme Court. We quote from the opinion of Judge McMeans: "The testimony in this case shows that it was a part of Phillips' duty under his employment to ascertain whether the freight being loaded by Hidalgo into his wagon had been authorized by the proper authorities, and his approach and inquiry of Hidalgo in that regard was an act clearly, we think,

within the scope of his duties and in the accomplishment of the object for which Phillips was employed. Hidalgo's reply apparently satisfied him, for without protest he turned away, leaving Hidalgo to complete the loading. It may be true, and doubtless is, that, in speaking to Annear about the matter at Sandal's house to satisfy himself that Hidalgo's statement to him was true, he was still acting for the master and within the scope of his employment. What further passed, the colloquy between himself and Hidalgo, and the shooting of the latter, clearly was not in discharge of any duty he owed to his employer, nor in furtherance of any object his employment was intended to accomplish, and therefore his acts were not such as to visit upon the defendant any responsibility for the consequences which ensued. The principles involved in this appeal are fully discussed in the cases cited."

Consistent with the principles just announced, we hold that no liability attached to defendant company under the circumstances of this record; by reason of which, it is not necessary to review appellant's further assignments. The judgment of the trial court is accordingly reversed and here rendered in favor of The National Life & Accident Insurance Company.