## JAX BEER CO. v. TUCKER.
### No. 12925.

Court of Civil Appeals of Texas. Dallas.
Nov. 30, 1940.

Rehearing Denied Dec. 21, 1940.

Kennemer & Armstrong, of Dallas, for appellant.

Johnson & Oliphant, of Dallas, for appellee.

YOUNG, Justice.

Appellant is here complaining of an adverse jury verdict and judgment in a damage suit brought by appellee Tucker. In making a brief statement of the cause and its disposition below, we will refer to the parties as they were originally styled. Plaintiff's action was for personal injuries following an assault made upon him, on June 4, 1938, by Buddy Dyer, an employe of the Beer Company. The petition alleged that said Company was engaged in distribution and sale of beer in Dallas, and employed a number of men for the purpose of making such sales and deliveries, among them being Dyer, whose authority was to operate one of defendant's trucks, to sell and deliver beer, and collect therefor; that he, Tucker, was an employe of Katz Market (a customer of defendant), and that Dyer made a sale for his employer to Katz and had collected and receipted for same; that after Dyer had departed, an error was found in the amount collected, and upon Dyer's next call at the Market, the error was brought to Dyer's attention; whereupon, after an exchange of words, Dyer struck him with great force and violence, inflicting personal injuries for which judgment was sought against defendant, including medical, hospital and X-ray bills. Defendant answered with demurrers and denial, alleging specially that Dyer was not acting within the course of his employment at the time, in that, all beer checked out to Dyer was charged to him, and any credit sales were made at his own initiative and risk, the assault being an adventure of such employe alone; that Dyer had departed from the premises of the Katz Market following the argument with plaintiff concerning the previous collection, and had completed his mission for defendant before the assault occurred; furthermore, the altercation was provoked by plaintiff, the employe Dyer acting in self-defense.

The jury answers to given issues were: That the striking of plaintiff by Buddy Dyer immediately grew out of the performance by said Dyer of his duties as an employe of defendant Beer Company; that on all credit sales of Jax Beer made to Katz Market by Buddy Dyer, the latter, individually, did not extend such credit; and that, in striking plaintiff, said Dyer did not reasonably believe he was in apparent danger. Damages were assessed at $3,000, which became the court's judgment, after defendant's motion non obstante veredicto had been overruled. A request for peremptory instruction had been urged and refused at the close of the testimony.

It is the chief contention of appellant, presented in successive propositions, that

the evidence, viewed most favorably from the standpoint of the successful party, is wholly insufficient to raise issues, or support findings of liability; in other words, that Dyer, at the time of the assault, was indisputably not acting in furtherance of the affairs of his employer and for the purpose and object for which he was employed. The nature of Dyer's employment and his duties thereunder on behalf of appellant are not seriously controverted; and taking plaintiff's version of events leading up to the encounter, we think the record clearly establishes the following facts, viz: At the time, Buddy Dyer was a route salesman for defendant, employed on a straight salary, plus commissions on each case of beer sold, his duties being to deliver beer, collect therefor, and solicit new customers. Each morning, he would receipt for and take out a load of beer, and, at night, report in cash for the part sold and return any cases on hand. Beer not accounted for on this daily check would be charged to Dyer. He was not required to settle for cases checked to him in this fashion until Thursday of each week when the sum total of beer not accounted for in cash, for the preceding week, would be deducted from the driver's salary. It was Dyer's custom to extend this week's interval of credit to certain customers, including the Katz Market, by delivering to such store, the latter part of each week, a quantity of the Jax beverage, issuing to the Market a charge ticket of the amount on a Company form, retaining a copy to collect by. Settlement for this sale would be exacted of Katz by the following Wednesday or Thursday, the ticket, together with the cash, then being turned in by Dyer in his own weekly check up with defendant's office. The Market owner (Katz) had no charge account with Jax Beer Company, and had applied for none. The arrangement to settle each Thursday for beer delivered was with Dyer alone, and for the benefit and convenience of the two (salesman and customer). Defendant knew of these weekly credit transactions with Katz, but no record of the Company revealed such dealings except Dyer's "fill-in sheets", which showed disposition of the beer charged to him by his office, pending each Thursday's check up; and, had Katz, or any other customer, not paid for beer at such time, the shortage would be deducted from the salary of Dyer; the latter, in effect, extending the short-time credit at his own volition and risk.

On Thursday preceding the assault, Mr. Katz had made a regular settlement with Dyer, receiving a Company receipt signed by him, reciting "Credit on account for beer $32.75," which amount was turned over to defendant and credited to Dyer's account. The correct sum due and owing at the time was 50¢ less, or $32.25, but said employe was not aware of the mistake two days later when he made a routine call on the Katz Market, where plaintiff Tucker was in charge. To the inquiry of Buddy Dyer, if any beer was needed, plaintiff replied: "No, I don't need any today. * * * I want to see you though, I have got a ticket that there was an error in, a mistake, an overcharge." Dyer heatedly denied the error, and Tucker's statement of what followed is quoted:

"Q. What did he say? A. He said, 'It's a damned lie, I haven't made any mistake in a ticket,' and when he said that, I said, 'Buddy, there is no need to make a statement like that,' I said, 'Mr. Katz has been nice to you, and he figured the ticket, and I know that he is right about it.' And, so, he said, 'Well, it's a damned lie, and I am not going to correct nothing.' And so I turned around this time; there was a customer that walked up to the front of the meat box, and I told him, 'That's all right, go ahead and forget the 50 cent error, if that's the way you feel about it'—I said, 'That's all right, go ahead and forget the 50 cent error if that's the way you feel about it,' and I turned around to wait on this lady that was there, and when I turned around to wait on her, Buddy walked outside; and in the meantime, the Falstaff beer man drove up on the Canton Street side, headed west, at the lower end of the box, and I went out the door, and there was an ice box setting between the door and the front of the sidewalk, and I went by the side of the ice box to the Falstaff truck. * * *

"Q. What did you do then? A. I turned around and walked up the sidewalk towards the corner, where Buddy was standing.

"Q. Where was he standing? A. He was standing with his arms up on the cases, that were setting up between the sidewalk and the edge of the outer curbing of the street.

"Q. Did you use the sidewalk there to stack beer cases there, and exhibit your produce and so forth? A. Yes sir.

"Q. It was an open air place, where you use the sidewalk on both streets? A. Yes sir.

"Q. All right, when you walked up there, now, how long a time elapsed from the time you turned to wait on the woman, or the customer until when you walked up there to Buddy? A. Let's see—I would say about two minutes.

"Q. Did you say anything to him? A. I walked up there, and he was standing there, and I figured I could reason with him, and I said to him, 'Buddy, we have been nice to you; there is no need to do this way.' And when I said that, he reached and got me with his left hand—he had his face more to me than he did to the edge of the sidewalk, and he reached and got me with his right hand in my shirt here (indicating) 'and, I don't know—whether he pulled me toward him—but anyhow, it was so quick, he hit me in the temple here (indicating), and in my jaw here, with his fist, like that—just pulled me like that and hit me at the same time."

When defendant's office was apprised of the affray, prompt investigation was made and Dyer required to return the 50¢ difference. Though the place of the assault was on the sidewalk, it was likewise within the confines of the open air premises where plaintiff was employed.

■ We are mindful of the rule that an appellate court is at all times reluctant to disturb jury findings, and is even powerless to do so if same have any factual basis, yet it is equally true that a jury verdict does not bind either the trial court or the appellate body when the evidence does not justify the submission of issues, Thweatt v. Ocean Accident & Guarantee Corporation, Tex.Civ.App., 62 S.W.2d 250 (writ refused); the principle just stated being the gist of appellant's major propositions that this record is insufficient, as a matter of law, to support the judgment under review. On the other hand, appellee is equally positive that the jury answers are entirely consistent with proven facts. First logically to be considered is, the finding that Buddy Dyer did not individually extend credit on the sales made to Katz Market, meaning, in effect, that same was extended by the Beer Company. The testimony of Mr. Katz, plaintiff's employer, and Mr. Gabbert, office manager of defendant, expressly negatives the existence of any credit relation between these parties; also, the true situation is shown from the evidence of Dyer, the salesman, to be that the custom of a weekly accounting between the latter and his own office, was simply made use of by Dyer with certain of his customers. The result, in no sense, established credit dealings with defendant, Dyer alone being responsible to it for all sales made under such an arrangement. Dyer's testimony in this connection is quoted:

"Q. * * * did you or not extend any credit to Katz Market at Canton and Akard Streets? A. Yes sir.

"Q. What arrangements did you have in extending that credit, Buddy? A. Well, naturally as a salesman and getting paid on commission, I was trying to boost my sales, and like any other salesman I believed in stocking a man up; he would sell that beer I stocked him. So, I solicited Mr. Katz, and talked to him about setting off 15 cases at a time, and collecting for it the following Thursday. I explained how we checked up, and that the beer charged to me was checked up on Thursdays, and Mr. Katz agreed that it would help him and help me too; I would have more sales, and he would have the beer on display there at the same time.

"Q. When you would deliver beer there, what would you do with reference to making so many tickets? A. If I sold 15 cases, I would put it down; or, say 10 cases, with the deposit included, would be $21.50, and then, I would have, if 10 empties were returned, that would be $5.00, and deducting that, would be $16.50 I would charge him; I would put charge on there, 'Chg.,' is the way I would put it, and let Mr. Katz sign it, and I would keep a copy and let Mr. Katz keep one.

"Q. What did you do with your copy? A. I would keep my copy to collect by.

"Q. Did you ever turn it over to the Jax Beer Company? A. When I collected the money, yes sir.

"Q. If you didn't collect, who would pay for that beer? A. I would.

"Q. Did you ever have to pay for any that you delivered that way? A. Quite a bit, yet sir.

"Q. But not to Katz Market? A. Never to Katz Market."

Knowledge by the Jax Company of the above practice was entirely insufficient, we think, to constitute plaintiff's employer a credit customer of defendant, who had already charged the beer involved to Dyer, to be accounted for on check up day in cash or salary deduction; and the matter of the 50 cents shortage, out of which grew the assault, was a thing personal to the

salesman and plaintiff's market, including the adjustment thereof. Here it must be noted that defendant was not aware of the shortage when it credited $32.75 to Dyer, or at the time of the assault; and when the error was discovered, it was the salesman who was required to return the difference.

If we are correct in our conclusion concerning the state of the record relative to the jury finding under Issue No. 3, so, likewise, should be our holding on Issue No. 1, already quoted—that neither finding has support in the relevant testimony. The principle underlying respondeat superior in assault cases has been repeatedly defined by our appellate courts, whereby liability, or not, of the master under given facts can be clearly determined; as Judge Hickman's forthright discussion of the rule, in Home Telephone & Electric Co. v. Branton, Tex. Civ.App., 7 S.W.2d 627, affirmed in Tex. Com.App., 23 S.W.2d 294, will demonstrate. Counsel for appellee correctly states that the issue is, not whether the particular act (assault) was authorized, but whether the act done grew out of an authority which the master had conferred upon the servant, Gulf, C. & S. F. R. Co. v. Cobb, Tex.Civ. App., 45 S.W.2d 323; liability usually narrowing to the manner in which the servant performed the authorized act. Admittedly, the assault resulted from Buddy Dyer's refusal to make the adjustment contended for by plaintiff, but was the servant even impliedly authorized by his master to perform duties of this character? We think not. Dyer's sole mission for his employer on the day of the assault, was the sale of beer to this particular customer for the equivalent of cash so far as the Beer Company was concerned. It had charged this market with nothing; neither had it ever authorized Dyer to reconcile accounts with credit customers; the difficulty arising from Dyer's personal extension of credit to Katz, with which, appellant likewise had no concern. And the assaulting party (Dyer) not being engaged at the time in anything his employment contemplated, but in a transaction purely personal to plaintiff's own employer, we conclude, notwithstanding the jury answers, that the doctrine of respondeat superior is inapplicable to the act of violence here pictured. See National Life & Accident Ins. Co. v. Ringo, Tex. Civ.App., 137 S.W.2d 828 (writ refused), and authorities there cited and discussed. Although from another jurisdiction, the early case of McDermott v. American Brewing Co., 105 La. 124, 29 So. 498, 52 L.R.A. 684, 83 Am.St.Rep. 225, is quite analogous in fact. There the claimant sought to hold the Brewing Company in damages for an assault at the hands of its (defendant's) employe, who was a Company wagon driver, selling and distributing its products to customers. We quote from the headnote of the court: "* * * Plaintiff's employer was one of defendant's cash customers, to whom the driver was to deliver beer for cash. The driver delivered beer to him, and did not require the cash. The day after the sale he called for the price, and, as it was not paid, he sought to take matters in his own hands, and resorted to violence. The agreement between the driver of the wagon and the defendant was that cash would be required and brought back to the factory for the beer in his charge for sale, and, if he failed to return either the cash or the beer, he would be made to pay his employer by deducting the price from his salary. By the effect of the agreement under which the driver was employed, in collecting the cash at a different time and in a different manner than he was instructed to do, the employer was not made liable for the violent assault. * * *"

So, in the situation at hand, it is our opinion that the tortious act of Dyer was something entirely aside from any duty contemplated by his employment. Appellee argues, with much logic, that the facts of the instant case are squarely within the principles of the following cases: Chicago, R. I. & G. R. Co. v. Carter, Tex.Com.App., 261 S.W. 135; Davis v. Clark, Tex.Civ. App., 78 S.W.2d 1008; Supreme Court, 129 Tex. 520, 105 S.W.2d 190; Gulf, C. & S. F. R. Co. v. Cobb, Tex.Civ.App., 45 S.W. 2d 323; Central Motor Co. v. Gallo, Tex. Civ.App., 94 S.W.2d 821; Wells Fargo & Co. Express v. Sobel, 59 Tex.Civ.App. 62, 125 S.W. 925 (error refused); New Ellerslie Fishing Club v. Stewart, 123 Ky. 8, 93 S.W. 598, 9 L.R.A.,N.S., 475. All of these decisions were the subject of study in National Life & Accident Co. v. Ringo, supra, and, in each, it will be noted, the offending employe was in the midst of some duty authorized by his employment at the time of the assault, the manner of performing the particular act alone being censurable, with resultant recourse upon the master. The facts and circumstances of this record, we conclude, are clearly distinguishable

from appellee's supporting authorities and insufficient to invoke the doctrine that the principal should answer.

Appellant is shown to be one further remove from liability, in this: According to plaintiff's own testimony, argument about the overcharge in the store had been concluded, and the later sidewalk conversation appears to have been a casual one, personal only to them, Dyer then being engaged in nothing pertaining to his required duties. Our research on the subject discloses that, whenever warranted by the facts, Texas courts uniformly draw a line of demarcation at the interval when a given scope of employment ceases and the servant's own responsibility begins. "When the servant turns aside, for however short a time, from the prosecution of the master's work, and engages in the doing of an act not in furtherance of the master's business, but to accomplish some purpose of his own, whether in doing so he is actuated by malice or ill will * * *, there is no principle which charges the master with responsibility for such action." Hidalgo v. Gulf, C. & S. F. R. Co., 60 Tex. Civ.App. 433, 128 S.W. 683, 685 (writ refused).

By reason of our conclusions just reached, a consideration of appellant's propositions 5 to 8, inclusive, is pretermitted. Plaintiff's judgment below must therefore be reversed and here rendered in favor of appellant, Jax Beer Company.

Reversed and rendered.