## CITY OF HOUSTON v. WALL et ux.

### No. 11934.

Court of Civil Appeals of Texas. Galveston.
Dec. 11, 1947.

Rehearing Denied Jan. 22, 1948.

Judgment modified and as modified affirmed.

Walter E. Boyd, City Atty., Will Sears, First Asst. City Atty., and Bennett Lay, Asst. City Atty., all of Houston, for appellant.

Bracewell & Tunks, of Houston, for appellees.

CODY, Justice.

This was an action for damages to appellees' residence, resulting from the overflow of the waters of Plum Creek on August 27-28, 1945. It was brought by appellees against appellant, the City of Houston, on the theory that the overflow was caused by drainage works which were put in by the City in its governmental capacity, and that the injury resulting to their property was a "damaging" thereof within the meaning of Sec. 17, art. II, of the State Constitution, Vernon's Ann.St., which forbids private property being taken, damaged or destroyed for or applied to public use without adequate compensation.

The issues made by the pleadings of the parties, on which the court considered there was sufficient evidence to require submission to the jury, included the following special issues, which, as answered by the jury were, in substance:

1. The work of digging and deepening ditches emptying into Plum Creek, and of widening, deepening and straightening the channel of Plum Creek—all, upstream from appellees' residence—was a proximate cause of its waters overflowing appellees' property on August 27-28, 1945.

2. The sewer line, crossing the channel of the creek downstream from appellees' residence, was a proximate cause.

3. The combination of the works referred to in the foregoing special issues was a proximate cause.

5. The overflow onto appellees' property was not proximately caused by an unforeseeable and unprecedented rainfall in the drainage basin of Plum Creek.

Prior to submission of the special issues, appellant moved for directed verdict both at the conclusion of appellees' evidence, and at the conclusion of all the evidence,—and the City also seasonably moved for judgment notwithstanding the verdict. The City predicates its appeal on 5 points which, in substance, are:

1. The evidence was insufficient to go to the jury on whether the drainage work done in connection with Plum Creek by the City was a proximate cause.

2. The evidence was insufficient to go to the jury on whether the construction of the sewer line across the creek downstream from appellees' residence was a proximate cause.

3. The evidence was sufficient to compel the conclusion that overflow of the waters of the creek into appellees' residence was proximately caused by an unprecedented and unforeseeable rainfall, amounting to an act of God, and for which the City was not liable.

4. A single, isolated, non-recurring injury causing damage was not a taking or damage of appellees' residence within the meaning of Sec. 17, art. 1, of the State Constitution.

5. "The error of the Court in not sustaining the City's contention, that if plaintiffs' residence was damaged by the acts of the City done in connection with Plum Creek that the City's acts were lawful ones done in the exercise of rights and powers granted to the City by law to dispose of surface waters wherefore plaintiffs' damage was damnum absque injuria."

The version of the facts, stated in the light most favorable to appellees, is this:

That appellees' residence is located at 2518 Berkley Street, about a mile and a half or two miles downstream from the head of the creek. The nearest corner of the Wall (appellees') house is between 60 and 70 feet from the nearest creek bank. From the house the elevation slopes downward toward the creek, and about 10 or 12 feet from the house corner there is a sharp drop of 4 or 5 feet. The appellees have lived in their residence since 1932. Prior to locating his house where it is placed, Mr. Wall made inquiries from which he learned that it was not subject to overflow from the creek. In the year 1935, the high water mark did not reach to the

4-to-5-feet drop in elevation mentioned above. In the years 1941, and 1943, the high water reached to the level of his back porch. In the year 1945, on August 27-28, the water reached 2 feet above the floor of his house. Normally, the creek is only three or four feet wide.

That a change occurred in the behavior of the water of the creek in that as time went on the same amount of rainfall caused the water of the creek to rise higher. This testimony of Mr. Wall was confirmed by the testimony of other witnesses who lived near him and who testified in his behalf.

That the rain of August 27-28, 1945, in the area of the basin of Plum Creek was violent, but such rainfall was not different from on former occasions. Among other witnesses that confirmed Mr. Wall's testimony to this effect, was a Mr. Morris who had lived near the Wall house for 20 years. On cross-examination, he accounted for his certainty as to the amount of rainfall on various occasions on the ground that it was a hobby of his to measure rainfall.

That in this area, substantial variations in the amount of rainfall could and did occur, so that during the same rain there would occur substantially less rainfall in localities two or three miles apart. The City Engineer, Mr. White, admitted this. He testified that the rainfall of August 27-28, was the greatest in his knowledge. He based his testimony on records made outside of the Plum Creek basin. The records of the Weather Bureau Airport Station showed the terrific rainfall of 15.65 inches in the 24 hour period beginning at 6:38 p. m. August 27th. Of this total rainfall, 9.39 inches had fallen at 12:28 a. m., August 28th. The Airport Station was not in the Plum Creek basin, but was some four miles distant. The downtown Houston Weather Bureau Station, which was in another locality, and further away than the Airport Station, showed a record of 9.06 inches of rainfall in the same 24 hour period. This was less than the rainfall that was measured on the occasion of the heavy rain of 1943. This brings us to drainage work done by the City to accelerate the flow of the surface waters into Plum Creek, and to the sewer line which was built across the creek below the appellees' house.

That in the latter part of 1944, and in 1945, prior to August 27, the City carried on the work of widening, deepening and straightening the channel of Plum Creek, from a point 600 feet upstream from appellees' house to the head of the Creek. Said drainage work also included putting in ditches to accelerate the flow of the water into the Creek above appellees' house. One such ditch extends from a point near the head of the Creek (which flows generally in an easterly direction) in a west and northerly direction for about 2,800 feet. At the point of said ditch discharge into the creek, its depth is 5 feet. Its width at its bottom is four feet, while at its top its width is 18 feet. Said ditch tapers away to 2 feet deep, 3½ feet wide at the bottom, and 7½ feet wide at the top. There are other ditches that were so put in upstream from appellees' house. None of them extend, however, beyond Plum Creek basin. But one of them does divert water, which would naturally have flowed into the Creek downstream from appellees' residence, and caused such water to be emptied into the creek upstream therefrom. The work done by the City downstream from appellees' residence in 1944-1945 consisted of removing vegetation from the banks and channel of the creek. The channel downstream was not deepened, widened or straightened.

That, in the latter part of 1943, and the early part of 1944, the City built a sewer line across the creek at two points downstream from appellees' house. We will describe the sewer line nearest to appellees' house, 1,500 feet distant therefrom. It is rectangular in form, i. e., it is not round, at least not so on the outside. It has a height of 6 feet, 2 inches. Its bottom is 6 feet above the bottom of the channel of the creek. The depth of the channel at this point measured from the top of the banks, is 14 or 15 feet. Thus the top of the sewer line was approximately 3 feet from the brim of the banks, and closed off 40% of the cross section area of the Creek's channel.

Mr. White, mentioned above, is a drainage engineer for the City. He testified that the drainage work done in connection with Plum Creek was done by contract for the City, but done under his direction and

supervision. He testified that said drainage work was done to prevent rainfall from standing in pools, that is, to accelerate the drainage. He further testified that the work done on the channel of the creek, straightening, deepening and widening it, was to cause the water to run off more rapidly. We here quote literally, or give the substance of portions of appellant's brief, passim: "That the improvement of all of Plum Creek, both above and below the Wall house, was done in accordance with sound professional standards and was designed to carry a heavy runoff, ten inches in twenty-four hours; that this runoff would produce a depth of ten feet in Plum Creek; that with this runoff of ten inches, the water level in Plum Creek adjacent to the Wall property would still be about four inches lower than the Wall residence; that the capacity of the channel of Plum Creek, both above and below the Wall house, was designed to accommodate this ten inch runoff and ten feet of water at the extremely high rate of 875 cubic feet per second. All of these calculations were based on an assumption of the maximum rate of runoff, that is, 40 per cent."

Appellant further pointed out that Mr. White testified that the sewer across the Creek only raised the level of the flood a fraction of an inch at the Wall residence. Appellant's brief then goes on:

"The expert witness White tells us—that it was the violent rainfall and not the City of Houston that occasioned this damage. * * *

"The testimony of Wall and his neighbors that the Creek had never risen as high as it did in 1945 and that it used to run off quickly, viewed in its best light, presents nothing more than a surmise or suspicion that any operation of the City was connected with the action of the stream. It is not difficult also to surmise and suspect that the recent real estate developments north of the Wall house was the proximate cause of the flood, for it should be remembered that White testified that this development would increase the quantity of water or rate of flow to Plum Creek.

"But White, the only witness qualified to speak with authority, did not testify that the increased volume of water or rate of flow from any real estate development caused the flood, any more than he, or any one else, that the increased volume or flow from the City's operations caused the flood. His testimony was that he was familiar with the rain that fell on August 27-28, 1945, and that the flood would have been as high or higher in the Wall house, if the City had done no work at all. This is the direct evidence of a skilled drainage engineer fully acquainted with the facts. If Mr. White's testimony were open to doubt, if his conclusions were wrong, why didn't the plaintiffs bring forward another engineer to refute him."

From the matter just quoted it would appear, among other things, that the City is urging that it is not responsible for the drainage from real estate developments. We are not sure that we understand its position in this respect. But presumably it accepted the dedication of the streets in said recent real estate developments, including the drainage in connection therewith, and the same came under the City's jurisdiction. In any case, we do not understand that it is the position of the City that in the drainage work it failed to take into account all of the runoff of Plum Creek basin, or that it did not exercise jurisdiction thereover.

The City's first two points are to the effect that there was no evidence legally sufficient to show that the drainage work done by the City in connection with Plum Creek, including the sewer line built across the Creek, was the proximate cause of the water's overflowing appellees' residence; and the City's third point to the effect that the evidence compelled the conclusion that such overflowing was caused by an unprecedented rainfall.

In Davis v. Woolverton, Tex.Civ.App., 184 S.W.2d 659, 660, it was stated: "These, among other rules governing such a situation, have been so well established as to have become axiomatic:

"(1) The appellate court is bound by the jury's verdict, if there is any legal evidence to support it. Wixom v. Bowers, Tex.Civ. App., 152 S.W.2d 896.

"(2) The evidence must be viewed most favorably toward the appellees in so considering motions of appellants for peremptory instruction before, and for judgment notwithstanding, after the jury's verdict. National Life [& Accident Ins.] Co. v. Ringo, Tex.Civ.App., 137 S.W.2d 828, writ refused."

 Whether or not the rainfall of August 27-28, 1945, was unprecedented in Plum Creek basin was a question of fact to which non-expert witnesses, who observed it, and who had observed other prior rainfalls then were competent to testify. See Magnolia Petroleum Co. v. Johnson, Tex. Civ.App., 176 S.W.2d 774, 777. It is unquestionably true that the evidence failed to establish any negligence in putting in the drainage work, and that negligence could not have been inferred from the fact that the waters of Plum Creek flooded appellees' residence. But we cannot agree that the evidence was insufficient to support a finding of a causal connection between the drainage work put in by the City, and the overflowing appellees' residence. It is a matter of common knowledge that there is a causal connection between rainfall and flooding, and that the greater the rainfall, the higher the water will rise, everything else being equal. Since the testimony of non-expert witnesses to the effect that the rainfall of August 27-28, 1945, was no greater in Plum Creek basin than other rainfalls, etc., which had occasioned no flooding of appellees' house, was competent evidence to go to the jury, and since said evidence was in conflict with the testimony of the expert witness White, it was for the jury to determine which testimnoy was the more credible. Indeed, as we understand the testimony of Mr. White, who was not present in Plum Creek basin when the rain fell, the basis of his conclusion that the rainfall was unprecedented was largely due to his belief that if it had not been, there would have been no flooding, because the drainage work was so constructed as to prevent flooding, except with reference to an unprecedented rainfall.

Since the drainage work admittedly accelerated the drainage of the rainfall into the Creek, and since such acceleration of drainage, etc., was the principal if not the sole change in conditions in Plum Creek basin prior to the rainfall of August 27-28, and since said rainfall was not greater than on former occasions when appellees' residence was not flooded, we are unable to hold that such evidence is not sufficient to support as a legitimate conclusion that such drainage work was a proximate cause of the flooding. Furthermore, it was not necessary that the evidence should have been sufficient to support all of the special issues on proximate cause of the flooding.

Appellant's fourth point is that the court should have sustained the City's contention that a single, isolated, nonrecurring injury causing damage was not a taking or damaging of appellees' residence within the meaning of Sec. 17, art. I of the State Constitution. We overrule the point. At the outset we wish to point out that the jury evidently did not accept the City's theory that the rainfall of August 27-28, 1945, was unprecedented and that the flooding would have occurred had the drainage work not been done.

In State v. Hale, 136 Tex. 29, 146 S.W.2d 731, 736, the court held, passim, " * * * the liability for adequate compensation for private property * * * damaged for public use is not based upon the ground that the act of * * * damaging such property was done negligently or intentionally. The true test is, did the State intentionally perform certain acts in the exercise of its lawful authority to construct such highway for public use which resulted in the * * * damaging of plaintiffs' property, and which acts were the proximate cause of the * * * damaging of such property." Again, "The liability of the State * * * for * * * damaging * * * private property for public use, where the authority is properly exercised, should not be confused with the claim for damages caused by the negligent acts or wrongs committed by its agents or officers. * * * The right to exercise this authority, and the command to adequately compensate the owner for such property, are expressly provided * * *," Again, "We think that the intention of the words 'damaged or destroyed' in the provision of the constitution under consideration was at all events intended to obviate any question of exemption from

liability to the owner for property injuriously affected by a public work, * * * '."

Under the authority of the holding in the Hale case, the City, as an arm of the State, had the right to put in the drainage work which it did put in. But if such work caused appellees' property to be injured by an overflow of the waters of Plum Creek, the City is required to adequately compensate appellees. And no question of negligence arises in this case, because the City had the right to do what was done. Under the constitutional provision, if appellees proved that the drainage works was the proximate cause of the injury to their property, it was the duty of the City to adequately compensate appellees.

■ The City's fifth point asserts that any acts done by the City in connection with Plum Creek, were lawful acts done in the exercise of rights and powers granted to the City by law to dispose of surface waters, and that any damage caused thereby to appellees' property was damnum absque injuria. We overrule the point. It is unquestionably true that in obedience to law requiring it to dispose of surface waters the City had the power and lawful right to dispose of them so as to injuriously affect appellees' residence. Except for the provision of Sec. 17, art. I, of the State Constitution, any damage done to appellees' residence in the course of the City's so performing its legal duty of disposing of surface waters as it saw fit would constitute appellees' injury, damnum absque injuria. But under the express provision of said section of the Constitution, it is the City's duty to make, and appellees' right to receive adequate compensation therefor. Appellees urge a crosspoint which they designate as their seventh counterpoint, urging that the court erred in not rendering a judgment to include the amount which appellees were found to have been damaged by way of lost value to their property.

There were three special issues submitted to the jury on damages, being Nos. 6, 7, and 8. In answer thereto the jury found in substance:

6. The sum of $1000.00, if now paid in cash, would fully and fairly compensate appellees for the injury to their furniture as a proximate result of the overflow, proximately caused by the work done by the City, taking into consideration the difference between the value of the furniture before the overflow and afterward, and no other factor.

7. The sum of $2,640.00, if now paid in cash would so compensate appellees for the injury to their house and garage as a proximate result of the overflow of their property, proximately caused by the work done by the City, taking into consideration the reasonable expense of such repairs as were reasonably necessary, and no other factors.

8. The sum of $2,750.00, if now paid in cash, would compensate appellees for the injury to their real property as a proximate result of the overflow proximately caused by the work done by the City, taking into consideration the difference in value of their real estate before the said overflow and afterward, and no other factors.

The court declined to render judgment so as to include the item of $2,750.00, but rendered judgment for $3,640.00.

■ The drainage by the City, though it will require maintenance, is permanent in character. Under appellees' version of the facts, which was accepted by the jury, the rainfall of August 27-28, 1945, was not unprecedented. It was only such a rainfall as appellees or their witnesses had witnessed in the creek basin on various occasions during the preceding 20 years. The only factors in the case which were unprecedented, under appellees' version of the facts, were (1) the drainage work by the City, which was intended to and did accelerate the flow of the rainfall into the creek; and (2) the elevation of the rise in the Creek to the point where it flooded appellees' property. As pointed out above, we reached the conclusion that appellees' evidence made out a case to go to the jury. Such evidence made out a case of a rainfall which was not unprecedented, a rainfall such as had fallen in Plum Creek basin on other occasions before the drainage work had been put in, a rainfall such as had not caused the waters of the creek to reach appellees' house before the drainage work was done. So, if appellees made out a case at all they made out a case of permanent injury to their real

670

estate. If they made out a case at all, they made out a case of where in future years like rainfalls may be expected to recur, accompanied by like floodings. If, as the City contends, the evidence established that the rainfall of August 27-28, 1945, was unprecedented, then appllees failed to make out any case to go to the jury on the drainage work being a proximate cause of the flooding.

■ The statute of limitations on the right of appellees to recover for any future flooding (i. e., to recover for permanent injury) began to run on August 27-28, 1945. See City of Ft. Worth v. Baker, Tex.Civ. App., 205 S.W.2d 68. We believe the issues have been so framed as to make them mutually exclusive. We mention this to show that if appellees did not sue for permanent damages, they would become barred.

We must sustain appellees' cross-point and modify the judgment so as to include as an item of appellees' damages, the item of $2,750.00, and as so modified, the judgment is for the sum of $6,390.00. As so modified the judgment is affirmed.

Affirmed.

On Appellant's Motion for Rehearing.

■ The effect of art. I, Sec. 17, of the State Constitution is to make the State, and its subdivisions, the indemnifier for damage directly caused to private property by the exercise of eminent domain. This is the import of the holding in State v. Hale, 136 Tex. 29, 146 S.W.2d 731. In that case, the Supreme Court considered it advisable to caution against confusing liability under such constitutional provision, with liability based on negligence as the proximate cause of damage. It may be of assistance in avoiding such confusion to call attention to another situation where liability to indemnify is imposed upon a ground other than negligence. We refer to an insurance policy which indemnifies the insured against loss directly resulting from a peril insured against. It is held in insurance cases that "proximate cause" in insurance has essentially the same meaning as it has in negligence cases, but with this difference; in insurance cases "the element of foreseeableness or anticipation of the injury as a prob-

able result of the peril insured against is not required." Federal Life Ins. Co. v. Raley, Tex.Com.App., 109 S.W.2d 972, 974.

■ The liability imposed by the aforesaid constitutional provision does not apply to consequential damages. Trinity & S. Ry. Co. v. Meadows, 73 Tex. 32, 11 S.W. 145, 146. In the cited case the Court said: "If a corporation do an act which it acquires a right to do by virtue of its franchise granted for a public use, and if a person having no franchise could not have done the act lawfully, and the property of another is directly damaged, then we understand that the constitutional provision requires that notwithstanding the franchise the corporation shall be liable." To acquire title to its right of way, a railway company has the right to condemn it, and must indemnify the owner of the property condemned. But after the railway company has acquired title to its right-of-way, it is related thereto as an owner, and the railway company is then liable in connection therewith as an owner of property. The fact that it originally acquired title by condemnation has no bearing on its liability for the use it makes thereof. Hence a railway company's liability for the use it makes of its property, after it has acquired it, must ordinarily be grounded on actionable negligence.

■ But in the present case, the work of installing and maintaining the drainage work was itself the act of exercising eminent domain. The damage, if any was caused to appellees' property thereby, was not consequential; for if, as the jury found, such damage was the proximate result of such drainage work, then such damage was the effect of the act of the city's exercising eminent domain. Stated otherwise, the city's function of exercising eminent domain, in effecting the drainage work, did not become functus officio at any period of time during which it was engaged in installing such work. At no time could the city have been halted in the doing of such drainage work, because it performed such work in virtue of its power of eminent domain, and for a public use. So, if the flooding was directly caused by such exercise of its governmental function—and that was for

the jury to say—the city was liable for the damage directly caused by its exercise of its governmental function, in virtue of aforesaid constitutional provision.

Appellant's motion for rehearing is refused.