GREATHOUSE v. TEXAS PUBLIC UTILITIES CORPORATION.

No. 2678.

Court of Civil Appeals of Texas. Eastland.
Dec. 3, 1948.

On Rehearing Dec. 30, 1948.

On Second Motion for Rehearing
Jan. 21, 1949.

R. Stansell Clements, of Lamesa, and W. C. Huffaker, Jr., and Truett Smith, both of Tahoka, for appellant.

Carl Rountree, Karl Cayton, and Mac Wassell, all of Lamesa, for appellee.

GRAY, Justice.

Bertie Lorene Greathouse, surviving wife of Oliver Greathouse, deceased, for herself individually and as guardian and next friend of their five minor children, and as next friend for Billie Louise Greathouse, a minor born of a prior marriage of said Oliver Greathouse, sued Texas Public Utilities Corporation for damages for the killing of said Oliver Greathouse by one G. L. Walton, an employee of said defendant. In response to Special Issue No. 1, the jury found that at the time of said killing, said Walton was acting within the course of his employment. By answers to subsequent special issues, the jury found damages to the plaintiffs in a sum exceeding $20,000. Upon motion, the trial court rendered judgment for the defendant notwithstanding the verdict. The plaintiffs appealed.

Appellee was engaged in the manufacture and distribution of ice in the town of Lamesa, Dawson County, Texas. Said G. L. Walton was employed by appellee as an ice delivery man, operating a light truck or pick-up and assigned to a particular area within the town. Oliver Greathouse lived in said area and was one of Walton's customers. The fatal altercation occurred on a Sunday afternoon in August, 1946. Walton was accompanied by his wife on this occasion and there was strong evidence that he was intoxicated. An ice card was at the front of the Greathouse home. Walton stopped his truck in front of the house and called to Greathouse, who was standing in the door, to come to his truck, which he did. The evidence showed that Walton first asked Greathouse if he was the man with whom he (Walton) had had some words on Sixth Street on a preceding day. Greathouse replied that he was the same man. Greathouse approached and stood by the cab of the truck while Walton and Mrs. Walton remained seated in the cab. Mrs. Walton testified that the conversation was

about the ice. Mrs. Greathouse and her children heard very little of the conversation, except that Greathouse told Walton to go on and that he would get ice another day, but that if he (Walton) was looking for trouble, he would probably find it. Finally, Walton got out of the truck, advanced toward Greathouse and struck him with his fist. A terrific fight ensued in which Walton was severely beaten. After the fight, Walton returned to his seat in the truck. Then Mrs. Walton sold Greathouse fifty pounds of ice, which he chipped from a one hundred pound block and carried it into the house. Payment was made to Mrs. Walton. The evidence showed that Walton's custom was to deliver the ice and place it in the refrigerator. Greathouse returned to the front yard, then told Mrs. Greathouse or one of the children to bring a pan of water and a cloth so he could wash the blood from Walton's face and clean him up so that he might go on his way. The water and cloth were brought, whereupon Walton got out of the cab and went to the rear of the truck and Greathouse proceeded to wash the blood from his face. Greathouse stooped down to rinse the blood from the cloth and as he straightened up, Walton struck him on the back of the head with his ice tongs, knocking Greathouse unconscious and from the effects of which he died three days later. The question here presented is whether at said time, Walton was acting within the scope of his employment. As stated above, the jury found that he was acting within the scope of his employment, but the trial court was of the opinion that as a matter of law, Walton had stepped aside and engaged in a mission of his own by reason of the aforesaid assaults on Greathouse.

The law reports contain many cases of suits against the master for injuries inflicted by the servant while allegedly acting within the course of his employment. This seems to have been a fertile field for litigation in many jurisdictions. The law has been clarified by considered decisions and does not now present much difficulty. The real problem consists in a correct application of the law to the facts in a particular case. Helpful briefs have been filed in this appeal by both appellants and appellee.

The applicable law is well stated by Judge Alexander while a justice of the Court of Civil Appeals at Waco, in the case of Central Motor Co. v. Gallo, 94 S.W.2d 821, 822. We quote:

" 'If the act complained of was within the scope of the servant's authority, the master will be liable, although it constituted an abuse or excess of the authority conferred. The master who puts the servant in a place of trust or responsibility, or commits to him the management of his business or the care of his property, is justly held responsible when the servant, through lack of judgment or discretion, or from infirmity of temper, or under the influence of passion aroused by the circumstances and the occasion, goes beyond the strict line of his duty or authority and inflicts an unjustifiable injury on a third person.' 39 C.J. page 1285, § 1476.

"The real test of the master's liability is, not whether the servant's employment contemplated the use of force or whether the act complained of was done in accordance with the master's instructions, but whether the act complained of arose directly out of and was done in the prosecution of the business that the servant was employed to do."

In said case, an argument arose between the service manager of a garage and a customer over work done in the garage on the customer's automobile. The service manager struck the customer, severely injuring him. The master was held liable. It should be noted that the assault took place in the shop and directly grew out of the price charged for the work or the quality of the work done; that no appreciable time elapsed from the beginning of the dispute until the assault; that said service manager undoubtedly had authority in the matter in dispute and the subject matter of same was of direct concern to the master.

Appellants also rely on the case of Felder v. Houston Transit Co., Tex.Civ. App., 203 S.W.2d 831. In that case, Felder's automobile collided with the rear of

a Transit Company bus. In the matter of collisions involving said company buses, it was the duty of the operator of the bus to get the name of the driver of the other vehicle, the number on his license plate and other pertinent information. Goodson, the bus operator, went back to Felder's car for that purpose. Felder refused to state his name, started reviling Goodson, got out of his car, laid his hands on Goodson's shoulder, and stopped Goodson as he was starting to the rear to get the car license number, whereupon Goodson struck Felder in the face with his money changing box. The trial court rendered judgment for the Transit Company, notwithstanding the verdict. On appeal to the Court of Civil Appeals, the case was reversed and rendered, which decision was affirmed by the Supreme Court. Justice Simpson, speaking for that court said, 208 S.W.2d 880, 881:

"There is little difference between the testimony of Felder and Goodson about most of the controlling facts. It is undisputed that Goodson, in keeping with his duties, went to Felder's car to get certain information, and while thus about his master's business and before he had finished his mission, committed the assault in question. This assault was so closely connected with the performance of Goodson's duties as to prevent the conclusion as a matter of law that when he struck Felder, he had ceased to act as the company's agent and had begun to act upon his own responsibility."

We note that when Goodson went back to Felder's car to get certain information, he was performing a duty and carrying out instructions incident to his employment. He was clearly acting for his master and about his master's business. Here, as in the Gallo case, supra, it all happened in so short a time, and was so closely connected with the performance of Goodson's duties for his master, as yet unfinished, as to prevent the conclusion as a matter of law, that when he struck Felder, he had embarked upon a mission of his own.

Another case on which appellants rely is Chicago, R. I. & G. Ry. Co. v. Carter, Tex.Com.App.1924, 261 S.W. 135. Briefly, the facts were as follows: Commerce Street in the City of Dallas extends east and west, ending on the west at the east end of a bridge across the Trinity River. On the east side of the river, said Railway Company had three tracks running north and south across Commerce Street. It being a busy thoroughfare, the Company kept a flagman stationed there to control traffic and prevent collisions. On the occasion in question, a teamster was driving west on Commerce Street and started to cross said tracks, when he was stopped by the flagman to prevent a collision with a switch engine approaching from the north. The switch engine passed by, but the flagman saw that it would soon reverse its course and re-cross Commerce Street. He refused to allow the teamster to cross until the train had passed back across the street. The teamster seemed impatient at being delayed and the flagman cursed and abused him, applying to him a vile epithet, whereupon the teamster got out of his wagon, his driving whip in hand, and started toward the flagman who rather hurriedly retreated to his shack near the bridge and closed the door. The teamster followed him to within a few feet of the shack when he was advised to stop by a third party, which he did. The flagman reopened his door and shot the teamster, causing his death. Among other facts found by the jury, were that at the time of the killing, the flagman was acting within the course of his employment and that the flagman was an unfit person for that particular work. The case was affirmed by the Court of Civil Appeals, 250 S.W. 192, and by the Commission of Appeals, mainly because the jury had found that the flagman at the time of the shooting, was acting in the course of his employment. The facts in said case are not analogous to the facts in this appeal, as will appear from the following excerpts from the Commission of Appeals' decision [261 S.W. 136]:

"The jury found that at the time the flagman went to the shanty and got his gun and killed Carter he was continuing in his duties as watchman to deal with Carter, and we understand the law to be that, if

there was any substantial evidence upon which to predicate such a finding, the verdict of the jury cannot be disturbed by this court, regardless of what our opinion is as to the real facts. The Court of Civil Appeals in their opinion say:

" 'The evidence tended to show that the movement of the train which took it across the track was but the process of clearing a main track, and that the train was ready to come back across the intersection in going on a siding when the altercation was ended by the shooting.'

"And we are bound by this finding of fact, and, as stated, after the train had passed, the flagman was still cursing the teamster, which would tend to show that the flagman was still trying to keep the teamster from crossing the tracks until the train had recrossed the street after going on the siding. That the teamster was clearly acting within the scope of his employment at the time the personal controversy began there can no doubt, and the facts also clearly show that the difficulty was a continuous one from the time it began until the shooting, as found by the jury. The whole time of the difficulty was very short, and it would be extremely difficult for us to determine just when the flagman ceased to act within the scope of his employment and began to act as his own master, if he was so acting at the time of the shooting, and under the peculiar facts of this case we do not think that the law can undertake to say just when the flagman ceased to act as agent, or that he did so cease, but that the finding of the jury on that matter should govern.

"There being evidence from which the jury might find that the flagman was continuing in his duties at the time he killed the teamster, and, having so found, and having also found that the shooting was an unbroken continuation of the controversy, we cannot disturb these findings."

To review all the authorities cited by appellant would prolong this opinion to an undue length, and we shall now notice some of the authorities relied upon by appellee for affirmance of the case. Appellee concedes that all inferences must be indulged in favor of the jury verdict before the trial court may render judgment non obstante veredicto, but their contention is that the jury's answer to Special Issue No. 1, that at the time of the fatal difficulty, Walton was acting within the scope of his employment, was wholly without support in the evidence, and that the trial court was correct in concluding as a matter of law that Walton was not at said time acting within the scope of his employment.

Appellee cites the Supreme Court case of International & G. N. Ry. Co. v. Anderson, 82 Tex. 516, 17 S.W. 1039, 1040, 27 Am.St.Rep. 902, in which Justice Gaines states the applicable law as follows:

"To hold the master liable for the act of his servant, it is not necessary that the servant should have authority to do the particular act. The act of the servant may be contrary of his express orders, and yet the master may be liable. But the act must be done within the scope of the general authority of the servant. It must be done in furtherance of the master's business, and for the accomplishment of the object for which the servant is employed. For the mode in which the servant performs the duty he is engaged to perform, if wrongful, and to the injury of another, the master is liable, although he may have expressly forbidden the particular act. But whether the act in question can be implied from the general authority conferred upon the servant must, in general, depend upon the nature of the service he is engaged to perform, and the circumstances of the particular case."

In said case, a brakeman ejected a man who was attempting to board a box car of defendant's freight train as it was leaving a station. The trespasser fell and was severely injured. One defense interposed by the defendant was that the brakeman was not acting within the scope of his employment. The plaintiff prevailed in the trial court, but on appeal, the Supreme Court held that the brakeman had neither express nor implied authority to eject persons from the train, that authority being vested in the conductor or engineer, and the case was reversed and remanded. In this appeal, the uncontradicted evidence showed that the employee Walton, had no

authority except to sell and deliver ice to customers within his territory. He was not authorized to settle or adjust disputes. He was required to collect for the ice sold and account to the company for all sold and unsold. He was supervised by the manager. The manager was asked:

"Q. From the time he was checked out with his load of ice, was he on his own, I mean, without any further supervision from you or any of the rest of them, until he came back into the company office after having delivered the ice? A. Well, he didn't report anywhere else. He came back to the plant if he got anything further."

The statement from said Anderson case, quoted above, is still the law in Texas and given effect by the courts. Therefore, the sentence, "It (the act complained of) must be done in furtherance of the master's business, and for the accomplishment of the object for which the servant is employed," has especial application here, as will be subsequently pointed out.

The case of National Life & Accident Ins. Co. v. Ringo, Tex.Civ.App., 137 S.W. 2d 828, 829, writ denied, is in point with what has been said above. P. L. Brown was an employee of said company with authority to collect premiums and credit same in receipt books. Ringo and family had four policies in said company, the premiums payable weekly. Brown called at the Ringo home, made a collection and credited same on duplicate receipt books, one of which was kept by the family. A dispute arose between Ringo and Brown as to whether the payment made was for one week or two or three weeks. Brown was told to leave and not return. They both moved to the front of the house when Brown invited Ringo to "come on outside and we will just fight it out." Ringo did so and was injured. On trial of the case, Ringo prevailed, but the Court of Civil Appeals reversed and rendered same in favor of the insurance company, holding that Brown's authority was limited to collecting and receipting for premiums and that he was not authorized to settle or adjust differences arising in the course of his employment. Said opinion cites and quotes

from International & G. N. R. Co. v. Anderson, supra, and reviews numerous cases on which appellant here relies, such as Chicago, R. I. & G. R. Co. v. Carter, supra, Tex.Com.App., 261 S.W. 135; Hidalgo v. Gulf C. & S. F. R. Co., 60 Tex.Civ.App. 433, 128 S.W. 683. We quote in part from said review of cases:

"We turn to a consideration of the cases cited by appellee, which are, principally: Chicago, R. I. & G. R. Co. v. Carter, supra; Davis v. Clark, Tex.Civ.App., 78 S.W. 2d 1008; Id., 129 Tex. 520, 105 S.W.2d 190; Gulf, C. & S. F. R. Co. v. Cobb, Tex. Civ.App., 45 S.W.2d 323, error dismissed; Central Motor Co. v. Gallo, (Waco) Tex. Civ.App., 94 S.W.2d 821; Wells Fargo & Co. Express v. Sobel, 59 Tex.Civ.App. 62, 125 S.W. 925, error refused; New Ellerslie Fishing Club v. Stewart, 123 Ky. 8, 93 S.W. 598; 9 L.R.A.,N.S., 475. In each of the above decisions, the act (assault or injury) was committed by the servant in doing that which he was employed to do. * * * For example, in the Cobb case, the injury followed an interference with switching duties of the engine foreman; and, in Central Motor Co. v. Gallo, supra, where the repair shop manager, authorized to adjust differences with customers, assaulted a patron while engaged in such duty, the court said (94 S.W.2d 822):

"'The real test of the master's liability is, not whether the servant's employment contemplated the use of force or whether the act complained of was done in accordance with the master's instructions, but whether the act complained of arose directly out of and was done in the prosecution of the business that the servant was employed to do.'

"More analogous to the present record is Hidalgo v. Gulf, C. & S. F. R. Co., supra, where the facts, briefly, were: Phillips, the watchman, was employed to guard railroad property and to see that freight at the depot was carried away by authorized persons. He challenged the teamster Hidalgo's right to load articles from the depot onto a wagon and, after some words, went over to an adjacent boarding house, to which the teamster also repaired after completing his load. Phillips there asked

defendant's warehouse foreman, Annear, about the freight, and was assured that same had been properly checked out to Hidalgo. A colloquy immediately ensued between the watchman and Hidalgo, in which the latter was killed. A suit against the railroad company resulted in a directed verdict for defendant. An appeal was affirmed and writ of error expressly refused by the Supreme Court. We quote from the opinion of Judge McMeans:

" 'The testimony in this case shows that it was a part of Phillips' duty under his employment to ascertain whether the freight being loaded by Hidalgo into his wagon had been authorized by the proper authorities, and his approach and inquiry of Hidalgo in that regard was an act clearly, we think, within the scope of his duties and in the accomplishment of the object for which Phillips was employed. Hidalgo's reply apparently satisfied him, for without protest he turned away, leaving Hidalgo to complete the loading. It may be true, and doubtless is, that, in speaking to Annear about the matter at Sandal's house to satisfy himself that Hidalgo's statement to him was true, he was still acting for the master and within the scope of his employment. What further passed, the colloquy between himself and Hidalgo, and the shooting of the latter, clearly was not in discharge of any duty he owed to his employer, nor in furtherance of any object his employment was intended to accomplish, and therefore his acts were not such as to visit upon the defendant any responsibility for the consequences which ensued. The principles involved in this appeal are fully discussed in the cases cited.' "

A case very much in point is Home Telephone & Electric Co. v. Branton, 7 S.W. 2d 627, 629, by this court, the opinion by Judge Hickman, then Chief Justice. Paul Beardon was the local manager for appellant at Rising Star, with such duties and authority as are usually conferred upon local managers of exchanges. Appellant erected a telephone line along the highway, but the particular pole, guy wire and anchor which were the cause of the trouble between appellee and Paul Beardon were erected on and attached to appellee's land by appellant's construction crew without appellee's knowledge or consent, and in such manner as to render appellant a trespasser in erecting same thereon. Branton went to see Beardon several times with reference thereto, but nothing was done about it by Beardon. On the occasion of the assault, Branton had started to the telephone office, but met Beardon coming out. Branton directed an epithet at Beardon, who struck him, causing injury. In the trial court, Branton recovered against Beardon and the company. After stating the applicable rule of law and citing many authorities, Judge Hickman said:

"Applying this test to the facts of the instant case, as disclosed by appellee's own testimony, the inquiry arises: In what manner was Paul Beardon furthering the business of appellant when he committed the assault? According to appellee's own testimony, he was struck by Beardon as an immediate resentment of an insulting epithet applied by him to Beardon. Beardon was not engaged in the erection of the telephone pole upon appellee's land, nor in the removal thereof when the assault occurred. The assault within itself was not necessary to and did not have the effect of either continuing the alleged trespass or removing it from appellee's land. While the erection of the telephone pole was the remote cause of the difficulty, it was too remote to connect appellee with it."

That part of the judgment against the company on account of the assault was reversed and rendered.

The case of A. B. C. Stores v. Brown, Tex.Civ.App., 105 S.W.2d 725, 726, is also in point. Brown was a customer and carried some groceries to be checked by the cashier. An argument arose over amount of the purchase. Brown said, "You keep the groceries and I'll keep the money." The cashier followed Brown to his car outside the store. Brown drove off, calling Davis a vile name. Brown drove around a block, then came back into the store, whereupon Davis knocked him down, injuring him. The evidence showed that Cammack, the store manager, was present and separated the parties, and then di-

rected the negro porter to give Brown first aid for his injuries. Brown sued and recovered judgment. The Court of Civil Appeals reversed and rendered in favor of the Company, holding that Davis in striking Brown, was not acting within the scope of his employment. After setting out the law in such cases, the court said:

"In the case before us it is apparent, we think, that Davis' assault on Brown did not come within the rule of liability; or even if it be assumed that the original dispute between Brown and Davis with reference to payment for the groceries did originate in the line of Davis' duty to his employer, and was in furtherance of the employer's business, still the assault and battery which forms the basis of this suit certainly did not. The assault occurred subsequent to the argument and after the plaintiff, Brown, had left the defendant's premises and returned. In returning to the store Brown did so, not to trade, but on a personal mission to satisfy his resentment against Davis, aroused by Davis' alleged mistreatment of him and for the purpose of reporting it to the manager, Cammack. In doing that it was not necessary for him to have any dealings at all with Davis, and the assault and battery which followed, whether provoked or unprovoked and willful, was a personal matter between Davis and Brown having no relation to the employer's business, and the defendant is·in no respect liable to the plaintiff for it.

"The fact that Davis' assault on the plaintiff did not occur in the line of his duty to his employer, but arose out of a matter personal to himself, fully distinguishes this case from such cases as Wells Fargo & Co. Express v. Sobel, 59 Tex.Civ.App. 62, 125 S.W. 925, and·Gulf, C. & S. F. Ry. Co. v. Cobb, Tex.Civ.App., 45 S.W.2d 323, cited by the appellee."

A very similar situation arose in the case of Jax Beer Co. v. Tucker, Tex.Civ.App., 146 S.W.2d 436, 439. Buddy Dyer, an employee of the Beer Company, was a beer delivery man. Following an argument between Dyer and Tucker, a customer, over an alleged error of $0.50 in payment of credit extended by the employee to the customer, Dyer struck Tucker. On appeal, the Court of Civil Appeals said in part:

"Admittedly, the assault resulted from Buddy Dyer's refusal to make the adjustment contended for by plaintiff, but was the servant even impliedly authorized by his master to perform duties of this character? We think not. Dyer's sole mission for his employer on the day of the assault, was the sale of beer to this particular customer for the equivalent of cash so far as the Beer Company was concerned. It had charged this market with nothing; neither had it ever authorized Dyer to reconcile accounts with credit customers; the difficulty arising from Dyer's personal extension of credit to Katz, with which, appellant likewise had no concern. And the assaulting party (Dyer) not being engaged at the time in anything his employment contemplated, but in a transaction purely personal to plaintiff's own employer, we conclude, notwithstanding the jury answers, that the doctrine of respondeat superior is inapplicable to the act of violence here pictured."

▆ Numerous other authorities to the same effect might be cited. We think, however, that it is unnecessary to do so. It is very clear from the cases considered above that to hold the master liable.for the tort of the servant, certain things must appear: (a) The tortious act must have arisen in the performance of a duty of the servant under the authority conferred upon him; (b) it must have been in furtherance of the master's business; (c) and negatively, the servant must not have stepped aside from his master's business to engage in a mission of his own.

▆ In this case, the evidence did not disclose the exact cause of.the first assault by Walton, but circumstances strongly suggest that it was due to resentment for something that passed between them on a preceding day on Sixth Street. On the fatal Sunday afternoon, an ice card was displayed at the front of Greathouse's residence. It indicated the number of pounds of ice desired. Under his instructions and manner of delivery, Walton should have delivered the ice into.the refrigerator

inside the house, collected for it and have gone on his way. But he made no move to deliver the ice, and instead, he called to Greathouse to come out to his truck. It was not shown that during the quarrel which ensued or at any time afterward, Walton undertook to deliver the ice, which fact lends support to the theory that said assault grew out of something that had transpired before. At any rate, it would be far fetched to assume that when Walton alighted from his cab, advanced toward Greathouse, who retreated a few steps, and assaulted him, that Walton was thereby performing some duty under his employment, or in furtherance of his master's business. Home Telephone & Electric Co. v. Branton, supra. After the said first fight, Walton returned to the truck, climbed into the cab and closed the door. It was then that Mrs. Walton told Greathouse that if he got ice, he would have to get it himself. She delivered to him the ice pick with which he separated fifty pounds from a larger block and carried it into the house while Walton remained in the cab. But when the ice had been taken into the house by Greathouse and the pan of water and cloth brought out, and payment made to Mrs. Walton for the ice, Walton then came to the rear of the truck to have the blood washed from his face. The courts have not been able to deduce a hard and fast rule applicable under every state of facts, as to when a servant or employee turns away from the duty assigned him and engages on a mission of his own. One test applied in the Carter and other cited cases is whether the assigned mission had been completed at the time the assault or injury was inflicted. Applying said test to the second assault by Walton, we are forced to the conclusion that he assuredly was not now acting for his employer. The fact that he took with him the ice tongs, concealed behind his back, showed malice, resentment and a fixed purpose to have his revenge. It was not in furtherance of his employer's business, but a personal matter of his own.

We conclude that under the evidence, the trial court did not err in holding that the facts in evidence were insufficient when given every intendment, to support a judg-ment for plaintiffs; that he would have been authorized to direct a verdict for said defendant, and that he did not err in rendering judgment for appellee, notwithstanding the jury verdict.

Appellants' second point alleges error by the trial court in rendering judgment non obstante veredicto without first having given appellants reasonable notice thereof. The record shows that while written notice was not given, appellants' attorneys orally agreed to the setting of the motion for judgment and was present and participated in the hearing thereon. Appellants thereby waived the formal notice. No injury was shown. We overrule the point.

The judgment of the trial court is affirmed.

### On Rehearing.

Appellants have filed a very able and interesting motion for rehearing in the above entitled and numbered cause, alleging (a) that we erred in our original opinion in holding that the trial court would have been authorized to instruct a verdict for defendant, appellee here, and that the court did not err in rendering judgment notwithstanding the verdict; (b) that we were in error in our holding that plaintiffs in the court below had waived notice of such hearing for judgment non obstante veredicto.

We have carefully reviewed the record in said cause and adhere to our holdings in the original opinion, except as to the second assignment of error. We therefore overrule the first assignment. A careful re-examination of the record discloses that we were in error in our original opinion in holding that the record showed a waiver of notice for judgment notwithstanding the verdict. The judgment of the court below contains no recitals with reference to notice to appellants, or their appearance on the hearing, nor recitals such as would reasonably show waiver of notice. Concededly, notice was not given and the only reference to the question of a waiver was found in appellee's brief. Under Rule 301, Texas Rules of Civil Procedure, and decisions of the courts construing same, and particularly the holding of the Courts on the identical question here

involved, where there was no affirmative showing as to notice or recitals in the judgment as to notice or appearances of the defendant, the judgment entered on the motion would not be presumed to be regular and should be reversed. Such a reversal does not necessitate that the case again be tried on the merits, but proceedings subsequent to the verdict must be set aside.

We, therefore, sustain the second assignment of appellants to the extent that said cause be reversed and remanded with instructions to the trial court to set aside all proceedings and orders heretofore had and made in said cause subsequent to the verdict; that due and legal notice of a hearing on the question of judgment notwithstanding the verdict be given appellants, and upon hearing the trial court enter such judgment, or make such orders as he may deem proper in the premises, and in accord with our original and this opinion. See Rule 301, R.C.P.; Hines et al. v. Parks et al., 128 Tex. 289, 96 S.W. 2d 970; Wheeler v. Wallace, Tex.Civ.App., 167 S.W.2d 1043; Johnson v. Woodmen of the World Life Ins. Soc., Tex.Civ.App., 203 S.W.2d 331; Gentry v. Central Motor Co., Tex.Civ.App., 100 S.W.2d 215; Seastrunk v. Walker et ux., Tex.Civ.App., 156 S.W. 2d 996.

On Second Motion for Rehearing.

PER CURIAM.

On December 3, 1948, we affirmed the judgment of the trial court which was rendered on appellee's motion to disregard the verdict. On December 30, 1948, we concluded that the record failed to show notice of appellee's motion for judgment notwithstanding the verdict. We, therefore, granted appellants' first motion for rehearing and reversed the judgment and remanded the cause with instructions to the trial court to give notice on said motion and upon a hearing thereof to enter such judgment as the trial court might then deem proper.

Thereafter, appellants filed their second motion for rehearing, insisting, as heretofore, that the trial court erred in rendering judgment notwithstanding the verdict

for appellee and contending that we should reverse the judgment and render judgment for appellants on the verdict. We adhere to our former opinion on this question.

■ Appellants now say that to reverse the judgment because notice of appellee's motion for judgment notwithstanding the verdict is not shown would only cause rendition of the same judgment and delay decision of the questions presented and cause them to incur additional expense. They now abandon the point which we sustain on their first motion for rehearing. Since appellants abandon and withdraw their point that the court erred in rendering judgment notwithstanding the verdict without notice to appellants, the judgment rendered by this court on December 30, 1948, granting appellants' first motion for rehearing and reversing the trial court's judgment and remanding the cause is now set aside and the judgment of the trial court is affirmed.