## TEXAS & P. RY. CO. v. HAGENLOH.
### No. 4789.

Court of Civil Appeals of Texas. El Paso.
June 13, 1951.

Rehearing Denied July 25, 1951.

Burges, Scott, Rasberry & Hulse, El Paso, for appellant.

John Paul Jones and Hildebrand, Bills & McLeod, Oakland, Cal., Carroll W. Smith, El Paso, for appellee.

McGILL, Justice.

Appellee recovered a judgment against appellant for damages alleged to have resulted from an assault made upon him by C. B. Houghland, a Special Officer employed by appellant, whose duty among others was to protect company property and to make investigations concerning and to recover missing and stolen property of passengers on appellant's trains. The assault is alleged to have occurred at about nine o'clock P. M. on July 27, 1947, at Toyah, Texas. It was alleged that the assault was made by Houghland while acting within the scope of his employment with appellant, and in furtherance of appellant's business. Trial was to a jury, which in answer to special issues found in substance that (1) at the time Houghland accosted appellee he did so in pursuance of one or more of his duties as agent of appellant; (2) that Houghland struck appellee without cause or provocation; (3) that appellee did not provoke or invite the assault; (4) that they did not find at the time of the altercation that Houghland was off duty and not performing any duties for appellant and (5) damages suffered by appellee as a consequence of the assault was $7,400. Judgment was rendered in accordance with these findings.

Appellant has presented twenty points "propositions" on which this appeal is predicated. Appellant timely moved for an instructed verdict and for judgment non obstante and the gravamen of the complaint here is that the trial court erred in overruling these motions. It is earnestly insisted that there is no evidence to support the jury's finding that at the time Houghland accosted appellee he, Houghland, did so in pursuance of one or more of his duties as agent of appellant. The rule governing the trial court and this court in determining whether appellant's motions for an instructed verdict and judgment non obstante should have been granted is that enunciated by the Supreme Court in Wininger v. Ft. Worth & D. C. R. Co., 105 Tex. 56, 143 S. W. 1150. The motions should not have been granted. "If, discarding all adverse evidence, and giving credit to all evidence favorable to the plaintiff, and indulging every legitimate conclusion favorable to the plaintiff which might have been drawn from the facts proved, a jury might have found in favor of the plaintiff. * * *" In other words, in passing on this question "It is our duty to disregard all conflicts in the testimony; to consider the evidence adduced in the case in the light most favorable to plaintiff, and to indulge in his favor every intendment reasonably deducible from the evidence." James v. Missouri-Kansas Texas R. Co. of Texas, Tex.Civ. App., 182 S.W.2d 921, 922 Wr.Ref. This rule has been many times followed. Wilder v. Malone, Tex.Civ.App. 212 S.W.2d 938.

"The jury were the judges not only of the facts proved, but of the inferences to be drawn therefrom, provided such inferences were not unreasonable." Lockley v. Page, 142 Tex. 594, 180 S.W.2d 616, 618. Najera v. Great Atlantic and Pacific Tea Co., 146 Tex. 367, 207 S.W.2d 365; Blake v. Rogers, Tex.Civ.App., 237 S.W.2d 457.

With this rule in mind we shall accept appellee's version of the evidence on which he relies to sustain the findings above referred to substantially as stated in his brief—not the inferences therefrom. These statements are not challenged by appellant and are supported by the statement of facts, which we have carefully read. In this

connection it is proper to say that appellee called C. B. Houghland to the stand as an adverse witness under Rule 182, Texas Rules of Civil Procedure, and claimed in the trial court and contends here that he is not bound by Houghland's testimony under the provisions of that Rule. Appellant contends that since Houghland had not been in its employ for approximately a year prior to the trial he was not an adverse witness within the purview of this rule, citing and relying on Dollahite-Levy Co. v. Phillips, Tex.Civ.App., 99 S.W.2d 688, (wr. dis.). We do not agree with appellant's contention. The cited case is distinguishable in that the witness in that case was not charged with having made an assault on the plaintiff, as here. It seems clear to us that such a witness is hostile and adverse under the rule, even though no longer employed by the corporate defendant.

The evidence on which appellee relies as outlined in his brief is here summarized: Appellee was employed by appellant in 1944 as a brakeman and continued in that capacity on different runs and under different assignments until the date of the assault; appellee's assignments were either as a brakeman on a freight run from El Paso to Toyah, Texas, or as a baggageman on a passenger run from El Paso to Big Spring, Texas. As a baggageman on the passenger run he had full charge of the mail and baggage while the train was en route and his duties consisted of routing the mail and baggage for different stations along the line and arranging for the forwarding of baggage beyond the terminals of his run. His responsibility over the mail and baggage ceased upon the train's reaching the terminal of his run when he left the baggage car.

C. B. Houghland had been a Special Agent employed by appellant since August 1945, and on July 27, 1947, and for some time prior thereto he had resided at Toyah, Texas, and was responsible for the area from El Paso to Big Spring, Texas. His duties as Special Agent consisted among other things of making investigations, searching for and recovering, if possible, lost or stolen property for his employer or shippers or passengers, occurring within his area of responsibility and called to his attention by his employer or learned of in the course of his employment. He was given a free hand as to his methods of investigation and procedure.

During the months of December, 1946 and January 1947 appellee was most of the time assigned to the passenger run from El Paso to Big Spring and return and was in charge of the baggage car. During the Christmas season of 1946 he first met Special Agent Houghland when he boarded his car and looked at the baggage and the men working in the baggage car and at the "pigeon holes", which was a box setting against the side of the car where company mail and little packages were kept. Later, in January, 1947, Houghland would board the baggage car and go through a brief case in which appellee carried company papers and then started to go through his personal overnight bag in which he carried some extra clothing and his lunch. He continued this procedure on numerous occasions until some time in March, 1947. During that month certain baggage had been picked up in Pecos, Texas, routed for California. While the train was en route the conductor told appellee that the passenger had changed her mind and wanted the baggage consigned to El Paso, whereupon appellee made the baggage car arrangements for the transfer.

About a week after this incident Houghland boarded appellee's baggage car at Toyah and told appellee that this baggage was supposed to have contained jewelry, which was missing, and inquired of appellee as to his knowledge of same, inasmuch as appellee was the only one who handled the baggage en route. Appellee denied any knowledge of the missing jewelry, although he remembered the incident of the transfer of the baggage picked up at Pecos, as it was unusual. Appellee had never been notified by any company official that anything was missing from his car and he learned of the missing jewelry for the first time from Houghland.

Thereafter, Houghland continued going through appellee's baggage and personal effects on numerous occasions. Appellee complained to Mr. Bishop, Superintendent

of Special Agents, and Houghland's immediate superior, who said he would look into the matter. In the meantime the periodic searching of his belongings continued.

About two weeks after appellee learned that the jewelry was missing, Houghland without prior notice came to his home with two members of the Federal Bureau of Investigation and asked to search through his home for the missing baggage. Appellee invited these men to look through his home, though they had no search warrant, but they refrained from doing so and left after requesting certain records which appellee was required to keep in connection with missing baggage, but he was unable to produce the record which they desired because he had sent his copy thereof to the company office.

The periodic searching of appellee's baggage car by Houghland continued into June, 1947, when appellee reported the matter to Mr. French, the Assistant Superintendent of the Railroad, telling him of the repeated searching of his car and personal belongings; of the visit to his home by Houghland with F. B. I. agents, and that he had reported the matter to Mr. Bishop, without avail. He requested a railroad investigation so that his status in the matter of the missing jewelry could be cleared up. Mr. French told him that it was the first he had heard of the matter and that he would look into it and let appellee know. Appellee heard nothing from French or Bishop and the periodic searching of his car continued.

Shortly thereafter the eastbound passenger train stopped at Monahans, Texas, and Houghland again boarded the train and searched through appellee's baggage car, the pigeon holes, the company brief case and started to look through appellee's personal suitcase. Appellee grabbed his suitcase and wouldn't let Houghland go through it, whereupon Houghland reported the incident to Mr. Bishop, who was at the time standing just outside the baggage car on the platform. Appellee told Mr. Bishop of the continuous search and that he objected to same. Mr. Bishop then in appellee's presence told Houghland that if he had anything against appellee to find out about it and settle it after he gets off the train "after you are through working" as the

train could not be held up. At that time Houghland shook his finger in appellee's face and stated "I am going to find out, that is exactly what I am going to do," and left the train. At the end of that run in Big Spring appellee reported the matter to Mr. Brannon, the Superintendent of the railway company, relating the entire incident from the beginning and stated that he was personally afraid of Houghland. Mr. Brannon said he had not heard of it and would investigate it and let appellee know, which he never did, and no investigation was held prior to July 27, 1947.

Two or three days later, and on July 27, 1947, appellee was a brakeman on a freight run from El Paso to Toyah and arrived at Toyah at 8:30 P. M. Upon arrival he left his train, deposited his grip and light in the railroad yard office and walked a short block to the Wells Cafe, where he ate his dinner. Toyah, Texas, is a very small town. The railroad tracks run in a general easterly and westerly direction and they are paralleled by a street a short block north upon the north side of which is located the Wells Cafe. Another street at right angles to the tracks runs south from the Wells Cafe and across the tracks just east of the yard office.

After finishing his dinner, appellee left the cafe intending to go to the yard office to pick up his bag and thence to his rooming house, which was located south of the tracks. He proceeded across the parallel street and down the road at right angles to the tracks and reached a point about forty feet from the northerly grade of the tracks when he heard somebody call from the vicinity of the railroad water tank located west of the road and just north of the tracks. It was after sundown, and very dark, the only light was that coming from the Wells Cafe and yard office, there being no street light. When appellee heard his name called he stopped and turned in the direction of the sound, and Houghland came up to him. As stated by appellee the following conversation took place: "Q. What was said? A. I waited until he came up to me and he said 'I want to talk to you about the baggage incident'. I said that 'I don't think this is the place to talk about

it, I would like to have an investigation, which I have asked for and probably will get'. He then stated 'I don't need an investigation'. He said 'I don't need an investigation, I have made up my mind to find out right now, right here, right now'. He said 'You are a thief, and you belong in the penitentiary', and I said—I don't remember just the exact words I said 'Well, how come' and he said 'Judge Schmidt told me', and I said 'That is a lie'. With that, as I was talking to him, had started around and trying to walk in the same direction I had originally started, turned away from him and when I said 'That is a lie' he hauled out and hit me with his right hand." Appellee ran to the yard office with Houghland in pursuit, and at the yard office door Houghland tripped him and caused him to fall, and as he got up hit him with his fist, knocked him down and he became unconscious. Upon regaining consciousness his watch was broken and stopped at 9:02 P. M.

The reason appellee wanted an investigation was due to the fact that Houghland was continually searching his baggage and personal effects, and in his opinion Houghland's acts were an accusation that appellee had taken something that did not belong to him. While Houghland did not accuse him of having stolen anything from the car he told him that the things were missing from his car and that he was the only person who handled the missing baggage. On one other occasion prior to the July 27 assault Houghland told him that he was continuing to search his belongings because he had not cleared up the Pecos jewelry deal and it was his job to do it.

Houghland testified that he was in charge of all railroad losses and thefts at Toyah. He learned of the baggage loss from a written report out of the Claims Department asking him to investigate and find out about the loss. He received no instructions as to the method of procedure but it was his job to know and to investigate and it was up to him to take care of it and see if he could locate it. He had a free hand as to the method. His reason for stopping appellee on the night in Toyah was to talk business with him regarding "a misunderstanding we had at Monahans due to my going on the car to get Bishop's mail, which he wouldn't let me do. * * * I have authority to get on any car, any coach or any train or on any engine, ride any portion of that train at any time that I see fit, over any portion of the district of the road that is under me, * * * and I know that I had that right and he didn't, and I wanted to straighten that part out." As part of the investigation Houghland went on his own accord to the F.B.I. in El Paso and reported the missing baggage and jewelry to the F. B.I. He went to Juarez, Mexico, with the F.B.I. and recovered some baggage without authorization of his superiors. His authority was "to inspect any articles of baggage and any losses or damages or anything that might be expensive or caused in the way of freight shipments, baggage shipments, passengers, injury to passengers or general welfare and taking care of the property of the company, and had a right to go through any baggage car and make such inspection as required." Houghland stated on the night of the assault he wanted "to talk to him (appellee) about public relationship as to employees of the company and his attitude, his personal attitude when he stated to Mr. Bishop that he didn't like that fellow and he didn't want him on his car anywhere." Houghland further stated that before the assault on that night he and appellee conversed about appellee's dislike of the continual searching of his baggage and belongings and Houghland's going to appellee's home with the F.B.I. regarding an investigation and accusation of theft in the baggage car with special reference to the loss of the jewelry. The transaction, from Houghland's standpoint, is best illustrated by the following from his testimony:

"Q. What was the first thing that was said when you got up there to Hagenloh at the station? A. Where?

"Q. At Toyah? A. Well, the first thing I said was: 'There is a misunderstanding here some way or another and the thing of it is we both work together and I want to talk to you.'

"Q. All right. Did you tell him what the misunderstanding was? A. I haven't yet.

"Q. What? A. I havent yet, no.

"Q. All right, when you said 'there was some misunderstanding and you wanted to talk to him about it', you were referring to a misunderstanding with reference to your employment and his employment on the railroad, that is correct, isn't it? A. No, sir.

"Q. All right. A. I am referring to a personal matter.

"Q. What? A. I am referring to a personal matter.

"Q. All right. Now, you said there was some misunderstanding and you wanted to get it straightened out. Now,— A. Yes.

"Q. Now, what misunderstanding did you have in mind? A. The fact that he didn't like me and I wanted to know for what reason it was that he didn't like me.

"Q. All right. He never had any social engagements with you. It was no social life between his family and your family or between you and he? A. No, sir.

"Q. All right. So, the only time you and he ever came into any relationship was in your employment on the railroad, that is correct, isn't it? A. Yes.

"Q. Now, then, what did you tell him the misunderstanding was? A. I told him the misunderstanding was that he didn't like me and I asked him what he had against me; that I had done him no damage, and he told me that I had.

"Q. All right. And what did he say? A. He said 'you went down to my house and caused me and my family embarassment by going down there.' I said 'well, I can't see as I did'. I said 'I didn't do a thing in the world but sit there in the car and only asked you a few questions. I made no accusations and I haven't accused anybody of doing anything or taking anything'. And he said that I had accused him of stealing some jewelry. I said 'no', that is one thing I haven't done. And he said 'it was', and he had asked for an investigation on it. I said 'well, that is perfectly all right because my reports

have already gone in and you will find, I am sure, on my reports that there is no accusation or anything; that my files are closed on it, there has been nobody accused of stealing or taking a thing in the world out of your car at any time in my reports.'

"Q. All right. Now that was—When you are speaking about accusing him of taking something out of the car you are speaking of the baggage car? A. Yes, sir.

"Q. And you are speaking of when you and he both had in mind the incident of that loss jewelry, are you not? A. At that particular time, yes. That was the cause of his ill feeling towards me.

"Q. And that is what you referred to when you said there was nothing in the reports—the report on the loss of jewelry is what you were taking about? A. Yes, sir.

"Q. By the way, on that day or that night in Texas, at Toyah had you recovered that jewelry? A. No, sir.

"Q. It is still an unsolved problem? A. It has never been recovered, no, sir.

"Q. And at that time it was still under your jurisdiction to try and solve if you could? A. No, sir, that file had been closed.

"Q. You mean that they work a few months and then if they can't recover, why, they close the file? A. I closed the file, yes, sir, and sent in my reports, my final reports.

"Q. Well, in the event you found it somewhere along the line then you would open that file again and send it in. You wouldn't overlook it, would you? It is part of your duty to find that property if you can? A. That is right.

\* \* \* \* \* \*

"Q. All right. Now, then, what was the next thing that was said there at Toyah? A. Well, the question will have to be repeated. I don't remember where we were.

"Q. Well, you said that he was upset because you went to his home and the investigation—and he didn't like it and he wanted an investigation and so on. A.

Yes. I told him that it was perfectly all right, that that is how he would find it; that he was not accused in any way, shape, form or fashion, and his personal attitude, I thought, was without any grounds; that he just didn't have any grounds to have a personal feeling towards me; that I made those investigations and made them with each and every employee on the railroad at all times if there was any loss or a car broken open or anything else; that I went to their homes, and many other employees of this company I have gone to their homes, and explained that to him, and called their names for him. And he told me that I didn't, and he demanded an apology, and I told him that I didn't have any for him; I wouldn't give it to him.

"Q. Well, now, as of that time you could see that the matter that you wanted to get straightened out wasn't making any headway, correct? A. I was doing the best I could.

"Q. Well, when he said he wanted an apology and you wouldn't give him one there was nothing more to talk about, was there? A. There never—There wasn't any apology I could give him.

"Q. Well, wasn't anything more for you and he to talk about then, was there? A I don't know. I tried to question him about it and to see about it, and I asked him why. What he had against me.

"Q. Then what was said? A. Well, he just told me that that was what he had against me, the fact that I came down there and had caused he and his family embarrassment.

"Q. All right. A. And I said 'I didn't', and he said 'you did'. And I said 'No, I didn't cause you any embarrassment because I never accused you at no time', and he said 'you are just a damn, lying son-of-a-bitch'.

"Q. And then—? A. Then I struck him."

Houghland denies that he was acting in the course of his employment at the time of the assault, and states that he was on a monthly salary, under contract, with two days off a month. He states that he asked Bishop for and obtained the 26th and 27th of July, 1947, as his days off and on the 27th he was not on duty, having taken his mother, who was visiting from California, on an automobile trip, returning to Toyah late in the evening.

We have tried to state the case fully from appellee's viewpoint, because as said in Greathouse v. Texas Public Utilities Corporation, Tex.Civ.App., 217 S.W. 2d 190 (wr. ref. n. r. e.) loc. cit. 192, in this class of cases "The law has been clarified by considered decisions and does not now present much difficulty. The real problem consists in a correct application of the law to the facts in a particular case." There is no substantial difference in the law applicable to this case as declared by Justice Gaines in International & G. N. Ry. Co. v. Anderson, 82 Tex. 516, loc. cit. 520, 17 S.W. 1039, 1040, Justice Simpson in Houston Transit Co. v. Felder, 146 Tex. 428, 208 S.W.2d 880, loc. cit. 881(2) and Justice Gray in Greathouse v. Texas Public Utilities Corp., supra, 217 S.W.2d loc. cit. 192(1, 2). We quote Justice Gaines: "To hold the master liable for the act of his servant, it is not necessary that the servant should have authority to do the particular act. The act of the servant may be contrary to his express orders, and yet the master may be liable. But the act must be done within the scope of the general authority of the servant. It must be done in furtherance of the master's business, and for the accomplishment of the object for which the servant is employed. For the mode in which the servant performs the duty he is engaged to perform, if wrongful, and to the injury of another, the master is liable, although he may have expressly forbidden the particular act. But whether the act in question can be implied from the general authority conferred upon the servant must, in general, depend upon the nature of the service he is engaged to perform, and the circumstances of the particular case." Justice Simpson: "The applicable rule in the situation here is well stated in Gulf, C. & S. F. Ry. Co. v. Cobb, Tex.Civ.App., 45 S.W.2d 323, 325, error dismissed, as follows: 'In practically all jurisdictions, the law is now settled that a master is liable for the willful and malici-

ous acts of his servant when done within the scope of his employment. Such acts are imputable to the master, under the doctrine of respondeat superior, and in accordance with the general principles that the master is liable for any act of the servant done within the scope of his employment, as well as for any act of the servant which, if isolated, would not be imputable to the master, but which is so connected with and immediately grows out of another act of the servant imputable to the master, that both acts are treated as being one indivisible tort, which, for the purposes of the master's liability, takes its color and quality from the earlier act.'" And Justice Gray:

"The real test of the master's liability is, not whether the servant's employment contemplated the use of force or whether the act complained of was done in accordance with the master's instructions, but whether the act complained of arose directly out of and was done in the prosecution of the business that the servant was employed to do."

Also we think there is no substantial difference between Question No. 1 in answer to which the jury found that Houghland, when he accosted appellee on July 27, 1947, did so in pursuance of one or more of his duties as agent of appellant, and the issue posed in Houston Transit Co. v. Felder, supra: Whether at such time Houghland was acting within the scope of his employment, and in Greathouse v. Tex. Public Utilities Corp., supra: Whether the assault arose directly out of and was done in the prosecution of the business that Houghland was employed to do. The only objection which appellant made to the submission of Question No. 1 was: "3. To the submission of Question No. 1 for the reason that the said issue is not raised by the evidence. There is not a scintilla of evidence that Houghland at the time inquired about was acting in pursuance of any duty as an agent of the defendant. On the other hand the evidence conclusively shows that at said time he was not performing any duty for defendant and was acting on a purely personal matter." This objection was insufficient to form a basis on which to predicate appellant's "proposition" No. IV, i. e., that the submission of Question No. 1 was error "for the reason that if there was any issue along that line it was whether Houghland was acting in the scope of his employment when he struck Hagenloh, not when he accosted him." This error was assigned in appellant's amended motion for a new trial, but this is not sufficient in the absence of an objection to the submission of Question No. 1 on the ground specified in the assignment. No citation of authorities is deemed necessary. The finding that Houghland accosted appellee in pursuance of one or more of his duties as agent of appellant is tantamount to a finding that the assault was made by Houghland while acting in the scope of his employment, or arose directly out of and was done in the prosecution of the business that Houghland was employed to do.

■ Appellee's contention that Houghland's testimony that his purpose in accosting appellee was to ascertain why appellee bore ill will toward him and to discuss relationship of company employees tends to show that Houghland was in pursuance of a duty for appellant is easily disposed of. If this were appellant's business at all it is certain that it was no business of appellant that Houghland was employed to do for appellant. However, we have concluded, though not without some doubt, that a jury issue was raised by the evidence and that we would not be justified in setting aside their finding. If Houghland's purpose in accosting appellee was to further investigate the missing jewelry, which had not been found, in doing so he was performing a duty which he was employed to do, and so was acting within the scope of his employment. His purpose in stopping appellee at the particular time and place is the crucial point. That purpose was known only to Houghland. It may be that his explanation is entirely consistent with the language imputed to him and his conduct on the occasion as testified to by appellee. Though it has sometimes been argued that in such a situation the witness' testimony as to his purpose is not admissible because of his

self-interest it has been definitely held in this state that such testimony is admissible. Hamburg v. Wood & Co., 66 Tex. 168, 18 S.W. 623. It is said that while truth of such testimony cannot be tested in the usual way, evidence and conduct and other circumstances furnish a sufficient safeguard against falsehood. Texas Law of Evidence, McCormick & Ray, Sec. 644. Houghland being, as we think, an adverse witness, the jury did not have to accept his explanation even though it is not contradicted except as his words and acts on the occasion in question may tend to contradict it. If his actions and his tongue on that occasion belie his later explana'ion the jury could indulge every reasonable inference from such action and words which tended to show his motive. As quoted from Lockley v. Page, supra [142 Tex. 594, 180 S.W.2d 618], "The jury were the judges not only of the facts proved, but of the inferences to be drawn therefrom, provided such inferences were not unreasonable." Houghland, appellant's special agent, concededly employed to investigate lost or stolen baggage of passengers and who had frequently searched the baggage car in charge of appellee for the jewelry reported missing, on the occasion of the assault first says: "I want to talk to you about the baggage incident." Why? "You are a thief, and you belong in the penitentiary * * * I don't need an investigation, I have made up my mind to find out right now, right here, right now." Certainly it is not unreasonable to infer from this language, considering the time and place and circumstances under which it was spoken, that it was Houghland's purpose to find out whether "a thief who belonged in the penitentiary" and whom Houghland had theretofore informed was the only one in charge of the baggage car from which the jewelry was missing, had stolen it even if he had to beat the truth out of the "thief" to find out. We do not attach much importance to Houghland's testimony to effect that he was entitled to two days off duty each month and that he had taken the 26th and 27th of July, 1947, as his days off. Even though this testimony was uncontradicted and the jury were bound to accept it as true, it is our view that a special

agent such as Houghland, employed to investigate loss of baggage on a monthly salary, not only had the right but that it was his duty to pursue his investigation at any time and on any occasion when in his opinion such investigation might lead to the desired result. Therefore the reasonable inference from Houghland's language and conduct on the night of the assault as testified to by appellee and which we accept as true, we hold is sufficient to sustain the jury's answer to Question No. 1 and we overrule appellant's contentions to the contrary.

■■ Appellant excepted to the admission of appellee's testimony as to Houghland's statements above on the ground that it had not been shown that Houghland was acting within the scope of his employment when he made such statements. We think the testimony was admissible. The evidence was ample to show that Houghland's duties included investigation of lost or missing baggage. In other words, that the scope of his employment comprehended such duty. His declarations alone at the relevant time were of course insufficient to prove that he was then acting within the scope of his employment, but were competent to show that he purported to so act, and his authority to so act was shown by other competent evidence. See Alford v. Thomas, Tex.Civ.App., 238 S.W. 270, loc. cit. 273(4). We note that in Houston Transit Co. v. Felder, supra, though the question was not raised, the Supreme Court based its decision on the testimony of Goodson, the bus driver, as to what he was doing at the time of the assault. If such testimony was incompetent it seems the point would have been raised. The "proposition" that if any issue was raised it was whether Houghland was acting within the scope of his employment when he struck appellee—not when he accosted him, is fully answered by the Supreme Court in the above quotation from Houston Transit Co. v. Felder, supra. Appellant's "proposition" that there is no evidence or insufficient evidence to support the jury's affirmative finding to question No. 2 and their negative finding to question No. 3 are easily disposed of. The substance of

these findings has been stated. We note that the language used by appellee "That is a lie" logically could refer to the statement attributed by Houghland to Judge Schmidt, and not to any statement of Houghland. However, if it is fair to assume that appellee's statement implied that Houghland was a liar, the time has not yet come in Texas when as a matter of law a man will be held to have provoked an assault upon his person by giving the lie to a false accusation "that he is a thief and belongs in the penitentiary". If anyone provoked anything as a matter of law we think Houghland provoked the statement from appellee that the accusation that he was a thief and belonged in the penitentiary was a lie. However, we hold that the jury's finding complained of by these "propositions" were amply supported by the evidence.

Since our view is that Houghland was an adverse witness, appellee's counsel had the right to lead him under the express provisions of Rule 182, T.R.C.P., and appellant's "propositions" to the contrary are without merit. For like reason the court did not err in refusing to strike appellee's testimony in which he denied applying to Houghland the vile epithet attributed to him.

 Appellant's bill of exception which was allowed and approved, and is the basis for one of its "propositions" is as follows:

"Be It Remembered that upon the trial of the above entitled and numbered cause, on the 14th day of June, 1950, while counsel for plaintiff was making his closing argument to the jury, counsel for plaintiff stated to the jury in his argument, that the testimony given by J. A. Wright, a witness offered by defendant as to the epithet applied by plaintiff Paul Hagenloh to C. B. Houghland, immediately before the said Houghland struck the said Hagenloh, was false, and in connection therewith stated to the jury that he had asked the witness Wright 'Did you give a report to the Company of that transaction?' and that the witness Wright said 'Yes'. He asked the jury if they did not remember that testimony, and counsel stated that

he remembered it, and counsel for plaintiff then stated to the jury that if the language testified to by the witness Wright had been in his written report that counsel for defendant would have had it in evidence before the jury, to which argument defendant then and there in open court excepted on the ground that it would not have been proper to put the said written statement given by the witness Wright to the defendant in evidence, it not being admissible; and the court failed to rule upon said objection, the Court saying, 'Well, I will consider it', but did not rule upon the objection, and did not sustain the objection made, by failing and refusing to rule upon the same, and stating that he would take it under consideration. The Court's statement, and the Court's failure to rule upon and sustain said objection, authorized the jury to belief that said written report was admissible in evidence and could have been introduced in evidence by defendant as a matter of right, which is contrary to the law; and all being to the prejudice of the defendant.

"The said argument by plaintiff's counsel was not in reply to any argument made to the jury by counsel for defendant, other than the argument as to what the witness Wright's testimony had been."

As a predicate on which to base reversible error in improper argument of counsel which can be cured by a ruling of the court the complaining party must not only object to the argument but the objection must be pressed to the point of procuring a ruling. Where the matter is left open for a future definite ruling, if the objection is to be relied on counsel should procure a final ruling before the conclusion of the trial. 41 Tex.Jur. p. 826, Sec. 90. Here, as said by the San Antonio Court of Civil Appeals " * * * it does not appear * * that appellant pressed its objection to the point of a ruling, or that a ruling was specifically invoked, so as to support a contention here that the court committed affirmative error. This conclusion is fortified by the absence of a motion by appellant to instruct the jury to disregard the objectionable argument." Tex. Compensation Ins. Co. v. Ellison, Tex.Civ.App., 71 S.W.2d

680

309, loc. cit. 314 (10, 11) (wr. dis.). We therefore decline to reverse on account of such argument. See also El Paso City Lines v. Prieto, Tex.Civ.App., 191 S.W.2d 59, this court, writ dismissed, want of merit.

■ Appellant timely excepted to the court's charge given in connection with the submission of question No. 5, which inquired as to the damages suffered by appellee. The portion of the charge complained of is "If you find that he will be prevented from laboring and earning money in the future as a proximate result of such blows you should take that into consideration." The objection on which the "proposition" is based was that there is no evidence which authorized this charge. Under the facts in this case there can be no valid distinction between a recovery for being prevented from laboring and earning money in the future and for reduced ability to earn money in the future. The quantum of proof required to warrant consideration of reduced ability to earn money was considered by this court in McAlister v. Miller, Tex.Civ.App., 173 S.W.2d 339, where the evidence was held sufficient, and in Martin v. Weaver, Tex.Civ.App., 161 S.W.2d 812 (w. r. w. m.) where it was held insufficient. The authorities are reviewed in Martin v. Weaver. We think here as in McAlister v. Miller the proof meets the requirement of the rule enunciated in Martin v. Weaver. The evidence was unquestionably sufficient to show a permanent impairment of at least 50% of appellee's hearing in one ear. His occupation and wages prior to and subsequent to the injury were shown. That his earning capacity or ability to labor and earn money in the future had been impaired, and the extent of such impairment and resulting loss was not left entirely to speculation without any factual basis. Of course such loss can never be fixed with mathematical certainty.

■ We think under all the facts disclosed by the record the verdict intrinsically evidences no passion or prejudice of the jury. The amount of damages to be awarded in such cases is largely within the discretion of the jury, and we feel that the verdict is not so excessive as to invoke the power of this court to set it aside or reduce it.

All of appellant's points ("propositions") have been carefully considered and are overruled. The judgment is affirmed.

Affirmed.